## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**KIMBERLY KATORA BROWN, <u>et al.</u>,**

Plaintiffs,

v.

Case No. 1:13-cv-0569 (CRC)

**DISTRICT OF COLUMBIA,**

Defendant.

## <u>MEMORANDUM OPINION</u>

Civil asset forfeiture laws—which enable law enforcement agencies to seize property

they believe has been involved in criminal activity—have generated considerable controversy in

recent years.  Citing a dramatic rise in the value of seizures, critics assert that police departments

are using the laws not to legitimately fight crime, but to generate revenue for dubious

expenditures, often at the expense of innocent property owners.  Defenders of the laws counter

that seizures have crippled drug and other criminal organizations while the proceeds of the

forfeitures enhance the ability of financially-strapped police departments to protect the public

from other crimes.  In either event, evidence has emerged suggesting that at least some police

departments have abused the civil forfeiture process, <u>see, e.g.</u>, Michael Sallah, Robert O'Harrow

Jr., & Steven Rich, <u>Stop and Seize</u>, Wash. Post, (Sept. 6, 2014),

http://www.washingtonpost.com/sf/investigative/2014/09/06/stop-and-seize/, which in turn has

led to public debate and legislative reforms in many jurisdictions, including the District of

Columbia.  The controversy has also generated lawsuits across the country challenging the

constitutionality of municipal forfeiture laws.  This is one such case.

The twenty-two Plaintiffs in this case are owners of cars or currency that they allege were improperly seized and retained by the District of Columbia Metropolitan Police Department ("MPD").  The seizures were effected under a prior version of Washington D.C.'s civil forfeiture statute, D.C. Code § 48-905.02 (2012).  Plaintiffs contend that various aspects of the former law, and MPD's implementation of it, violated their constitutional rights under both the Fourth and Fifth Amendments.  In sixteen separate counts, they generally allege (1) that they did not receive requisite notice that their property was subject to forfeiture, either at the time of or after the seizure; (2) that the law denied them a prompt and meaningful opportunity to be heard to challenge the seizure and continued retention of their property pending the ultimate forfeiture determination; (3) that the law impermissibly conditioned a judicial hearing on posting a bond and that MPD systematically denied waivers of this bond requirement to eligible claimants; (4) that MPD allowed some claimants, but not others, to challenge forfeiture of their property through informal "secret" procedures; and (5) that MPD routinely failed to return seized property that was no longer subject to forfeiture.  Plaintiffs bring their claims as a putative class action on behalf of themselves and others whom they allege have been harmed in similar ways.

The District moves to dismiss the amended complaint.  Upon consideration of the motion, the opposition and reply, the parties' arguments during the hearing on the motion, and for the reasons set forth below, the Court finds as follows:  It will dismiss Plaintiffs' Fourth Amendment claims because their challenges to the adequacy of the District's forfeiture procedures—as opposed to the propriety of the underlying seizures—are properly brought under the Fifth Amendment, not the Fourth.  The Court will also dismiss Plaintiffs' claim that the Constitution requires a prompt hearing after seizures of cash, as it finds that any relief an interim hearing could provide is outweighed by the government's interest in retaining seized currency.

The Court will dismiss as well Plaintiffs' challenge to the statute's lack of a requirement that MPD give notice at the time of seizure, which it finds is consistent with due process, and Plaintiffs' claim that the content of the notice MPD sent to claimants is insufficiently detailed. Finally, the Court will dismiss Plaintiffs' facial challenge to the statute's requirement that claimants post a bond—subject to an income-based waiver or reduction—in order to invoke judicial review.

The Court will deny the District's motion to dismiss in all other respects. It finds— consistent with the reasoning of the Second Circuit, the Seventh Circuit, and this court in Simms v. District of Columbia, 872 F. Supp. 2d 90 (2012)—that the government must provide a prompt opportunity for owners of seized automobiles to challenge the reasonableness of the seizure and propose means to protect the government's interest short of retaining their cars until the conclusion of forfeiture proceedings. The Court further finds that while the MPD notices comport with due process, certain Plaintiffs have plausibly alleged that the District does not issue the notices (or follow up on returned notices) in a manner reasonably calculated to reach claimants. The complaint also alleges plausible due process violations resulting from MPD's purported "secret" procedures for challenging forfeitures and its retention of property that is not deemed forfeitable or needed as evidence in a criminal case. Finally, although the statute's bond requirement does not facially violate due process, certain Plaintiffs have sufficiently pled that the District denied them bond waivers and reductions in violation of their due process rights. The Court will therefore deny the District's motion to dismiss as to these claims.[1]

---

[1]  Because each claim is brought by a subset of Plaintiffs and the circumstances of each Plaintiff differ—some, for example, received timely notice while others did not—the Court has included an appendix specifying which claims remain for which Plaintiffs.

**I.      Background**

A.      Civil Forfeiture Procedures in the District of Columbia

In February 2015, the Council of the District of Columbia enacted sweeping changes to

the city's asset forfeiture statute.  See Civil Asset Forfeiture Amendment Act of 2014, 62 D.C.

Reg. 1,920 (Feb. 13, 2015) (imposing stricter notice and reporting provisions; requiring the MPD

to inventory and catalogue seized property; reducing the bond requirement; giving owners an

opportunity to request interim release of their property; shifting the burden of proof from the

owner to the government; and providing that drug possession is no longer a forfeitable offense).

The new legislation addresses many of the infirmities in the prior version of the law alleged by

the Plaintiffs in this case.  Id.  The Court must nevertheless decide the merits of this motion to

dismiss, as Plaintiffs claim damages stemming from the District's past conduct under the pre-

amendment asset forfeiture regime.

The seizures and forfeitures at issue in this case were governed by former D.C. Code §

48-905.02 (2012).  That statute authorized MPD to seize, without a warrant, vehicles, currency,

or other property if police had probable cause to believe that the property was the proceeds of or

used in a crime or infraction.  Id. §§ 48-905.02(a), (d)(3)(A).  After a seizure, the statute required

the Mayor to provide notice to any person having "a right of claim to the seized property."  Id. §

48-905.02(d)(3)(A).  If an owner received notice, he or she needed to file a claim and pay a bond

of the lower of $2,500 or 10 percent of the appraised value of the property, but not less than

$250, in order to assert an interest in the property.  Id. § 48–905.02(d)(3)(B).  The claimant could

request a waiver or reduction of the bond requirement from MPD's Property Clerk.  D.C. Mun.

Regs. 6-A § 806.6-7.

If a claimant paid the bond, the District did not return the property.  Rather, it initiated judicial forfeiture proceedings in the District of Columbia Superior Court.  D.C. Code § 48-905.02(d)(3)(E) (2012).  If a claimant did not trigger judicial proceedings by paying the bond or obtaining a waiver, the property became subject to administrative forfeiture.  The statute required the Mayor to then determine whether the property was forfeitable.  Id. § 48-905.02(d)(3)(C).  The Mayor in turn delegated authority over those administrative forfeiture determinations to the MPD Property Clerk.  D.C. Mun. Regs. 6-A § 805.  The Property Clerk's decision was made *ex parte*; claimants had no formal opportunity to challenge the rationale for the original seizure, assert their rights as innocent owners, or suggest reasons they should be able to recover their property.  If the Property Clerk did not deem the property forfeitable or it was not needed as evidence in a criminal case, the statute required the District to return it.  D.C. Code § 48-905.02(d)(3)(C) (2012).

B.      Factual Allegations

As noted above, the Plaintiffs in this putative class action are owners of either vehicles or cash that was seized by the police incident to traffic stops or other arrests.  While the specifics of their allegations differ, all generally claim that the District's civil forfeiture regime was designed and implemented without regard for their constitutional rights.  The following allegations are illustrative of Plaintiffs' contentions.

Kelly Hughes alleges that her vehicle was seized merely because she had an "air freshener hanging from the rear view window and heavy tint."  Compl. ¶ 165.  Hughes says she spent hours calling the police and District agencies to recover her vehicle.  Id. ¶ 171.  When the police finally directed her to the impound lot, she claims the officer would not show her the copy of the seizure warrant.  Id. ¶ 173.  According to Hughes, she struggled to get to work and to a

truck driving course in Baltimore without her car, yet still had to make all the loan and insurance payments. <u>Id.</u> ¶¶ 179–80.

Another plaintiff, Takia Jenkins, claims her Mercedes was taken from the parking lot behind her house because someone (whom the police would not identify) had allegedly driven it in an illegal manner. <u>Id.</u> ¶ 184. She contends the officers told her she would never recover her car, or that it would be prohibitively expensive to do so. <u>Id.</u> ¶ 187. Jenkins says she repeatedly phoned the police, but was shunted from one department to another without being given any helpful information. <u>Id.</u> ¶ 188. Jenkins was pregnant at the time and had difficulty getting around without her car. <u>Id.</u> ¶ 200. When the police finally released the car to her after the authorities declined to prosecute the alleged driver, Jenkins alleges that the windows were broken, the interior was moldy, and she had to have it towed back home from the impound lot. <u>Id.</u> ¶¶ 194, 196–97.

Some members of the purported class contend they never received notice of the seizure of their property. <u>Id.</u> ¶¶ 138, 290, 375, 407. Julius Gordon, for example, claims he gave his correct address to the MPD when he was arrested and booked after a controlled substance stop but the police never sent a notice of any kind. <u>Id.</u> ¶¶ 300, 303. Jarrett Acey says he did not receive his notice until after the statute of limitations for filing a claim had expired. <u>Id.</u> ¶ 324.

Many Plaintiffs describe having to undertake Herculean efforts to retrieve their property amid police resistance. Ishebekka Beckford, for example, claims she asked the police for information about her vehicle and was given a non-working number to call. <u>Id.</u> ¶ 134. Beckford cared for her grandmother and needed the car to take her to medical appointments. <u>Id.</u> ¶ 143. Beckford says she called the police and made several trips to the station before the District of Columbia Public Defender Service convinced the police to release her vehicle. <u>Id.</u> ¶¶ 134–40.

Muslimah Taylor alleges she called MPD for weeks and visited the U.S. Attorney's office in an effort to locate her seized Chevy Tahoe. Id. ¶¶ 271–72. A police detective purportedly refused to give her the case number because he did not want her "getting [a] stor[y] together." Id. ¶ 273. Without her car, Taylor claims she could not take her children to summer camp and struggled to get to work, shop for food, and attend job interviews. Id. ¶¶ 275–76.

Plaintiffs assert that none of them were given an in-person opportunity to convince the MPD Property Clerk to return their property. Id. ¶¶ 466–68. They further allege the police thwarted their efforts to recover their property. Several Plaintiffs contend that the police discouraged them from applying for waivers of the bond requirement. Dorian Urquart, for example, alleges that after police seized his car from a private parking lot without a warrant, he was told that his bond waiver application would be rejected and he would never recover his vehicle. Id. ¶¶ 248, 259. Urquart claims that the loss of his car for over a year made it significantly more difficult to transport his hemophiliac son to and from the hospital. Id. ¶ 266.

C.      Plaintiffs' Legal Claims

Out of these and similar factual allegations, Plaintiffs fashion a variety of alleged constitutional violations of the Fourth and Fifth Amendments, spanning a total of sixteen separate counts. Some counts are joined by all Plaintiffs; others are asserted by a subset. Counts One and Two challenge the statute's lack of any requirement that MPD give notice to property owners—in the form of a receipt or some other notification—at the time of the seizure. Counts Three and Four challenge the absence of a prompt hearing after the seizure. Counts Five and Six allege that MPD, following a practice of insufficient notification efforts, failed to notify certain Plaintiffs of the seizure and potential forfeiture of their property. Counts Seven and Eight contend that MPD, again based on policy and practice, failed to notify certain owners that their property was deemed not forfeitable and could be retrieved. Count Nine challenges the

adequacy of the written notices that are sent to property owners.  Counts Ten and Eleven allege that MPD allowed some claimants, but not others, to challenge forfeiture of their property through "secret" procedures.  Counts Twelve and Thirteen facially challenge various aspects of the administrative forfeiture process.  Count Fourteen challenges the statutory requirement that claimants post a bond to obtain a judicial forfeiture hearing and alleges that MPD routinely denied bond waivers to eligible claimants.  Finally, Counts Fifteen and Sixteen allege that the aggregate effect of the District's former forfeiture regime violated both the Fourth and Fifth Amendment.  Plaintiffs seek judgment in their favor, declaratory judgments, injunctive relief, damages, and attorney's fees.

## II.     Legal Standards

The District's motion to dismiss should be granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This standard "does not require 'detailed factual allegations,' but it demands more than" bare accusations against the defendant.  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  In deciding the District's Rule 12(b)(6) motion, the Court "must accept as true all of the facts in the complaint."  Erickson v. Pardus, 551 U.S. 89, 93–94 (2007) (citing Twombly, 550 U.S. at 555–56).  Further, any ambiguities must be viewed in a light most favorable to the Plaintiffs, giving them the benefit of every reasonable inference drawn from the facts and allegations in the complaint.  In re Interbank Funding Corp. Sec. Litig., 668 F. Supp. 2d 44, 47 (D.D.C. 2009) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  Although the Court must accept all well-pled facts as true, legal allegations devoid of factual support are not entitled to this assumption.  See Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

III.       **Analysis**

A.       Fourth Amendment Claims (Counts 2, 4, 6, 8, 11, 13, and 16)

Six of Plaintiffs' claims—counts Two, Four, Six, Eight, Eleven and Thirteen—allege the District violated Plaintiffs' due process rights under the Fourth Amendment.  A seventh claim—count Sixteen—alleges a violation of "the equal protection requirements of the Fourth Amendment."  Compl. ¶ 524.  The factual allegations supporting these claims are duplicative of identical claims brought under the Fifth Amendment.  Plaintiffs nonetheless contend that "[t]he Fourth Amendment is an independent alternative basis for the prompt post seizure hearings" and other relief they seek.  Pls.' Opp'n to Mot. to Dismiss at 26.  Not so.  The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  While this protection extends to seizures conducted for the purposes of civil forfeiture, United States v. James Daniel Good Real Property, 510 U.S. 43, 49 (1993), Plaintiffs here do not challenge the reasonableness of the underlying seizures.  Rather, they challenge the constitutionality of the procedures employed following the seizures.  As the District correctly points out, those claims are properly raised under the Fifth Amendment, not the Fourth Amendment.  Id. at 48–49.  The Court will therefore dismiss Plaintiffs' Fourth Amendment claims.

B.       Post-Seizure Hearing (Count 3)

In Count Three, Plaintiffs allege that the statute's lack of an opportunity for a prompt, post-seizure hearing where owners can challenge the seizure and retention of their property violated due process.  To determine what procedures are required when the government seeks to take or retain a private interest, courts generally apply the three-factor balancing test set out by the Supreme Court in Mathews v. Eldridge, 424 U.S. 319 (1976).  The Mathews test weighs (1) the nature and weight of the "private interest that will be affected by the official action"; (2) "the

risk of an erroneous deprivation of such interest through the procedures used, and the probable

value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's

interest, including the function involved and the fiscal and administrative burdens that the

additional or substitute procedure would entail." Id. at 335.

In Krimstock v. Kelly, the Second Circuit applied the Mathews test in a constitutional

challenge to a New York City law permitting police to seize automobiles following a drunk

driving arrest. 306 F.3d 40, 46 (2d Cir. 2002). Writing for a unanimous panel, then-Judge

Sotomayor held that the Mathews factors, on balance, weighed in favor of providing owners an

early opportunity to challenge the seizure and retention of their vehicles. The court determined

that the first Mathews factor—the owner's interest in the property—tipped towards the car

owners because an "'individual has an important interest in the possession of his [or her] motor

vehicle'" given the "particular importance" that cars have "as a mode of transportation and, for

some, the means to earn a livelihood." Id. at 61 (citing Lee v. Thornton, 538 F.2d 27, 31 (2d Cir.

1976)). The court found that the second factor—the risk of erroneous deprivation—favored the

city because "a trained police officer's assessment of the owner-driver's state of intoxication can

typically be expected to be accurate." Id. at 62–63. The court broke the tie by finding that the

third factor—the city's interest—also favored the car owners. Responding to the city's "most

compelling" justification for retaining the seized automobiles, the court explained that "the need

to prevent forfeitable property from being sold or destroyed during the pendency of proceedings

does not necessarily justify continued retention of all vehicles when other means of

accomplishing those goals are available." Id. at 65. Having balanced all three Mathews factors,

the Court concluded that

> [d]ue process of law requires that plaintiffs be afforded a prompt post-seizure,
> pre-judgment hearing before a neutral judicial or administrative officer to

> determine whether the City is likely to succeed on the merits of the forfeiture
> action and whether means short of retention of the vehicle can satisfy the City's
> need to preserve it from destruction or sale during the pendency of the
> proceedings.

Id. at 67.

Six years later, the Seventh Circuit held in Smith v. City of Chicago, 524 F.3d 834 (7th

Cir. 2008), that prompt probable cause hearings were constitutionally required after seizures of

vehicles and currency under Chicago's asset forfeiture statute. And in 2012, Judge Sullivan of

this Court applied the Mathews test in a challenge to an automobile seizure under the same

version of the District of Columbia asset forfeiture law that is under review here. Finding that all

three Mathews factors favored the plaintiff, Judge Sullivan concluded that so long as the vehicle

is not being held as evidence, due process requires that car owners "be given a prompt, post-

seizure opportunity to test the validity of the initial seizure and of the District's continuing

retention during the pendency of forfeiture proceedings." Simms, 872 F. Supp. 2d at 104.

The District offers several arguments in an effort to avoid the results in Krimstock,

Smith, and Simms. It argues first that due process does not require the District to provide a

preliminary hearing because owners have other opportunities to challenge the seizure and

retention of their property. One such method, according to the District, is to make a motion for

return of property under Federal Rule of Criminal Procedure 41(g) or the identical D.C. Superior

Court Rule of Criminal Procedure 41(g). A Rule 41(g) motion, however, is available only "in

the context of an ongoing criminal proceeding." United States v. Price, 914 F.2d 1507, 1511

(D.C. Cir. 1990) (discussing Rule 41(e), recodified as Rule 41(g)). Many of the Plaintiffs were

not themselves criminally prosecuted. E.g., Compl. ¶¶ 172, 194. Although the District contends

that *other* people were subject to criminal penalties in some cases, there is no indication that the

District notified the affected Plaintiffs of the seizures in time for them to participate in those

11

proceedings. <u>Id.</u> ¶¶ 129, 273. And if an innocent owner misses the filing window and the criminal case is closed, Rule 41(g) may then be unavailable. <u>See</u> <u>District of Columbia v. Dunmore</u>, 749 A.2d 740, 744 (D.C. 2000) (holding that the trial court should have denied a Rule 41(g) motion once the criminal defendant was acquitted). Even when Rule 41(g) motions are available and timely, Plaintiffs contend—and the District does not contest[2]—that courts routinely deny them without prejudice in order to allow the District time to complete the requirements of the forfeiture statute. <u>E.g.</u>, <u>United States v. Sweet</u>, No. 04-0505, 2008 WL 2168936, at *1 (D.D.C. May 23, 2008) (denying a Rule 41(g) motion and ordering the District to file a notice concerning the progress of civil forfeiture proceedings). For those reasons, Rule 41(g) motions are either not available or do not provide the relief Plaintiffs seek—a prompt hearing to challenge the seizure and retention of property. Rule 41(g) motions therefore do not ensure due process under these circumstances.

The District also suggests that Plaintiffs could have invoked the equitable power of the D.C. Superior Court and requested the return of seized property pending a forfeiture decision. This was not a viable alternative to a preliminary hearing either. Property seized for forfeiture was "deemed to be in the custody of the Mayor" and was not "subject to replevin," so the D.C. Superior Court had limited ability to order its return. D.C. Code § 48-905.02(d)(2) (2012); <u>accord</u> <u>Dunmore</u>, 749 A.2d at 745 (holding that ordering the return of money was "incompatible with the statutory framework for deciding ownership of forfeitable property"). The District has

---

[2] In its pleadings in <u>Simms</u>, the District conceded: "A Rule 41(g) motion is not directly relevant to the civil forfeiture proceedings. Under District of Columbia law, a Rule 41(g) motion may be used to seek release of property that was unlawfully seized and thus not admissible as evidence in the criminal case, but it may not be used to adjudicate forfeiture issues, which may only be addressed in civil forfeiture proceedings." Defs.' Suppl. Filing, No. 12-cv-00701, at *2 (June 22, 2012).

therefore not established that property owners had any reliable means of securing the release of their property short of a prompt post-seizure hearing.

The District alternatively contends that the Mathews test does not govern the question of what process is due to owners of seized property.  It urges the Court instead to apply the four-factor test in Barker v. Wingo, 407 U.S. 514 (1972), which is used to determine whether a criminal defendant's right to a speedy trial has been violated.  In United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency, 461 U.S. 555, 565–69 (1983), and United States v. Von Neumann, 474 U.S. 242, 250–51 (1986), the Supreme Court applied the Barker test in challenges to the delay between the seizure of property and the subsequent forfeiture proceedings.  The District argues that $8,850 and Von Neumann establish Barker, and not Mathews, as the proper framework for assessing the Plaintiffs' due process challenge here.

The Court disagrees.  As then-Judge Sotomayor explained in rejecting the same argument in Krimstock, "the Constitution . . . distinguishes between the need for prompt review of the propriety of continued government custody, on the one hand, and delays in rendering final judgment, on the other."  306 F.3d at 68.  $8,850 and Von Neumann, like Barker itself, address only the latter.  Plaintiffs' claim, by contrast, is aimed not at excessive delay but at how much process is due between seizure and the ultimate forfeiture decision.  The Mathews test therefore applies.  See also City of Los Angeles v. David, 538 U.S. 715, 716 (2003) (applying Mathews in reversing a holding that an additional hearing was required after the municipality towed a vehicle); Gilbert v. Homar, 520 U.S. 924, 931 (1997) (applying Mathews to a claim for a predeprivation hearing); James Daniel Good, 510 U.S. at 59 (same); Tate v. District of Columbia, 627 F.3d 904, 908 (D.C. Cir. 2010) (Mathews test applied regarding procedures to auction an impounded vehicle); Propert v. District of Columbia, 948 F.2d 1327, 1331 (D.C. Cir.

1991) (<u>Mathews</u> test applied to the procedures for towing and destroying a vehicle). The Court will therefore apply the <u>Mathews</u> test to the District's seizures of vehicles before turning to seizures of currency.

i.     <u>Due Process for Seized Vehicles</u>

Balancing the factors outlined in <u>Mathews</u>, this Court joins with the courts in <u>Krimstock</u>, <u>Smith</u>, and <u>Simms</u> in concluding that due process requires the government to provide claimants a prompt hearing to challenge the grounds for seizure of a vehicle and the "'probable validity' of continued deprivation of [the] claimant's property during the pendency of proceedings." <u>Krimstock</u>, 306 F.3d at 48. Judge Sullivan's opinion in <u>Simms</u>, which analyzed the same version of the D.C. statute, provides a helpful roadmap for the <u>Mathews</u> analysis. The first <u>Mathews</u> factor—the private interest affected—points squarely towards the need for a hearing. "An individual has a strong interest in his car." <u>Simms</u>, 872 F. Supp. 2d at 100. Even in a city with public transportation options, a car may be a person's only means to earn a livelihood, attend school, see family, or attend to the necessities of life. Numerous Plaintiffs here have emphasized the importance of their vehicles. <u>See supra</u>, Section I.B. The likelihood that the government will prevail in the ultimate forfeiture proceeding does not diminish the owner's private interest in possessing her vehicle in the meanwhile. <u>See</u> <u>James Daniel Good</u>, 510 U.S. at 62 ("Fair procedures are not confined to the innocent."). For an innocent owner who loses a car for months without a means to contest the seizure, the loss is even more significant.

Turning to the second factor, the Court agrees with Judge Sullivan that there is at least some risk of erroneous deprivation when a seizure is based on a traffic stop, which most of the seizures here were. That is so because the validity of traffic stops "rests solely on the arresting officer's unreviewed probable cause determination." <u>Simms</u>, 872 F. Supp. 2d at 101–02. That

14

risk is heightened by the police's ability to retain the value of what they seize, together with their broad discretion to select the target of a search.  Given these risks of error, a prompt hearing provides important procedural safeguards by allowing an owner to test the probable cause for the seizure, assert defenses, and propose alternatives to the government retaining the property.  Prompt hearings may also reduce the costs to owners of an erroneous seizure—such as vehicle insurance and finance charges—that cannot be mitigated after the fact.

The final Mathews factor—the government's interest in maintaining the status quo—also weighs in Plaintiffs' favor.  As was the case in Simms, the government has not offered any evidence regarding the potential administrative burden of providing prompt hearings with respect to seized automobiles, and, indeed, it is now required to do so under the recently-enacted changes to the District's forfeiture statute.  Civil Asset Forfeiture Amendment Act of 2014, § 106(c)(3), 62 D.C. Reg. 1,920 (Feb. 13. 2015).  As for the government's most compelling argument on this prong of the test—protecting its interest in the seized vehicle—some means short of retention, such as a bond or restraining order, might "satisfy the City's need to preserve it from destruction or sale during the pendency of proceedings."  Krimstock, 306 F.3d at 67.  On balance, then, the Court concludes that due process requires a prompt hearing to enable a claimant to test the probable cause for a seizure and to propose alternatives to the government's retention of the vehicle pending the conclusion of forfeiture proceedings.

ii.  Due Process for Seized Cash

The Court reaches the opposite conclusion with respect to currency.  Ten Plaintiffs allege that the police seized cash from them—ranging from $5 to $8,118—following an arrest.  Half of the seizures occurred in connection with alleged drug offenses.  Application of the Mathews factors leads the Court to conclude that due process does not require a preliminary hearing after

currency seizures.  First, an individual's interest in seized cash is less than that in seized

automobiles because cash is fungible and easier to replace.  City of Los Angeles, 538 U.S. at 717

(holding that a temporary deprivation of money is less harmful than that of an automobile).

Second, the risk of erroneous deprivation, while still present, was lessened by the presumption

under the previous version of the District of Columbia law that any money found in close

proximity to forfeitable narcotics was also subject to forfeiture.  D.C. Code § 48-905.02(a)(7)(B)

(2012).[3]  There was no similar presumption for automobiles.  Likewise, the government's

interest in retaining seized currency is greater than in automobiles because there are fewer means

to prevent a claimant from dissipating the value of cash by simply spending it before the

conclusion of the forfeiture proceedings.  See Smith, 524 F.3d at 838 ("obviously the posting of

a cash bond for cash is an absurdity").  The Court will therefore grant the District's motion to

dismiss Count Three to the extent it alleges due process violations stemming from currency

seizures.

        C.    Notice

After MPD seized Plaintiffs' property, the District had to provide written notice of the

seizure and information regarding the procedures for claiming the property to any party that it

knew, or in the exercise of reasonable diligence should have known, had a claim to the property.

D.C. Code § 48-905.02(d)(3)(A) (2012).  Plaintiffs challenge several aspects of this notification

requirement.  They claim that the police were obligated to provide notice at the time of the

seizure, rather than later; they assert that the District's procedures for mailing notices were half-

hearted and ineffective; they contend that the content of the notices was insufficiently detailed;

---

[3]  As noted previously, the recently-enacted version of the law removes this presumption with
respect to controlled substance offenses.  See Civil Asset Forfeiture Amendment Act of 2014, §
201(b), 62 D.C. Reg. 1,920 (Feb. 13. 2015).

and they maintain that the notices did not describe alleged "secret" proceedings that were available to some claimants to challenge their seizures before the Property Clerk.  The Court will address each of these contentions below.

i.      Notice at Seizure (Count 1)

Plaintiffs contend that due process required MPD to notify them of the seizure of their property at the time it was seized.  They argue in Count One that even "a temporary, nonfinal deprivation of property" requires the provision of notice reasonably calculated to reach the interested parties.  Fuentes v. Shevin, 407 U.S. 67, 85 (1972).  As a result, Plaintiffs allege, "[m]ost police departments in large cities provide a receipt for all property seized from arrestees."  Pls.' Opp'n to Mot. to Dismiss at 14–15.  While that may be true, at-seizure notice is not constitutionally required.  The undisputed principle that police must provide notice of even a temporary deprivation says nothing about *when* that notice must be given, nor do any of the cases cited by Plaintiffs.  E.g., City of W. Covina v. Perkins, 525 U.S. 234, 240 (1999) (declining to decide "how detailed the notice of the seizure must be or *when the notice must be given*") (emphasis added); Schroeder v. City of New York, 371 U.S. 208, 213 (1962) (concerning a dispute over the quality of notice, not timing); Lightfoot v. District of Columbia, No. 1-1484, 2007 WL 148777, at *6 (D.D.C. Jan. 16, 2007) (addressing a dispute over predeprivation notice of termination of disability benefits without otherwise discussing timing).[4]  Most importantly, the Supreme Court has held that the seizure of personal property for forfeiture is "one of those 'extraordinary situations' that justify postponing notice and opportunity for a hearing."  Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 677 (1974) (upholding post-deprivation

---

[4]  Plaintiffs also attempt to bootstrap concerns about the contents and efficacy of the notice onto their argument that at-seizure notice is constitutionally required.  Such concerns are more appropriately addressed *infra* in the discussion of Counts Five and Nine.

notice and hearing after seizure of a yacht) (quoting <u>Fuentes</u>, 407 U.S. at 90).  The Court will therefore grant the District's motion to dismiss Count One.

      ii.      <u>Notice After Seizure (Count 5)</u>

Plaintiffs next challenge the District's system of post-seizure notifications.  Due process requires a method of notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  <u>Dusenbery v. United States</u>, 534 U.S. 161, 168 (2002).  Actual notice is not required, but reasonable efforts to achieve it are.  <u>Id.</u> at 169.  "'The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it'" because "'process which is mere gesture is not due process.'"  <u>Small v. United States</u>, 136 F.3d 1334, 1336 (D.C. Cir. 1998) (quoting <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>, 339 U.S. 306, 315 (1950)).  In Count Five, Plaintiffs allege that the District violated their due process rights by failing to mail notices at all or by sending them to an obviously incorrect address. Citing 2009 testimony from the District's former property clerk, they claim that the District does not follow up on undelivered notices, and that its notification procedures are ineffective in 70 percent of seizures.  Pls.' Opp'n to Mot. to Dismiss at 27.  In other words, Plaintiffs allege the District does not make a genuine attempt to provide actual notice.

The District counters that some Plaintiffs did in fact receive notice through the mail, as contemplated by the statute.  D.C. Code § 48-905.02(d)(3)(A) (2012).  It also claims that others learned of the seizure through other means such as court-appointed counsel.  While some named Plaintiffs acknowledge having received timely notice in the mail, others have adequately pled that they did not.  <u>See</u> Compl. ¶¶ 300, 303 (allegation of Julius Gordon that he did not receive notice despite giving police his correct address); <u>id.</u> ¶ 324 (allegation of Jarrett Acey that he only received notice after expiration of the statute of limitations).  The Court therefore cannot

determine at this stage whether the District's mailing efforts are reasonably calculated to provide actual notice. Moreover, the District cannot rely on the actions of public defenders to satisfy its burden under Dusenbery and Mullane. The Court will, however, grant the District's motion to dismiss as to Plaintiffs Steven May, Ramona Person, and Chiquata Steele—all of whom pled that they received timely notice. Compl. ¶¶ 213, 237, 396. Otherwise the motion to dismiss Court Five is denied.

> iii.       Content of the Notice (Count 9)

Plaintiffs move next to the content of the notice. The District provides owners with notice of a potential forfeiture via a Notice of Intent to Administratively Forfeit. That form lists the seized property, the statute permitting forfeiture, and the D.C. Code provisions and related regulations containing the forfeiture procedures. Def.'s Mot to Dismiss, Ex. A. In Count Nine, Plaintiffs allege that due process requires additional information in the notice, including the underlying factual basis for the seizure, the court case or arrest number connected with the seizure, and various details of the forfeiture process.

The Supreme Court has spoken directly to the issue. In City of West Covina v. Perkins, the Court held that the Constitution does not require the government "to give detailed and specific instructions or advice to owners who seek return of property lawfully seized." 525 U.S. at 236. It explained that while reasonable steps must be taken to inform the owner "that the property has been taken so [he] can pursue available remedies for its return," the government need not provide "individualized notice of state-law remedies which . . . are established by published, generally available state statutes and case law." Id. at 240–41. "Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him. The City need not take other steps to inform him of his options." Id. at 241. The same is true here. The notice apprises potential claimants that

their property has been seized and is subject to forfeiture, and points them to the statutes and

regulations outlining the procedures for challenging the forfeiture.  No further notice is required

to satisfy due process.  See also Litzenberger v. United States, 89 F.3d 818, 822 (Fed. Cir. 1996)

("Based on the clarity of this notice, we agree with the district court that it satisfies

Constitutional due process requirements.").  The Court will therefore dismiss Count Nine.

       iv.       Notice of "Secret" Proceedings (Count 10)

       If there was probable cause to support forfeiture of Plaintiffs' property, the MPD

Property Clerk was required to issue the Notice of Intent to Administratively Forfeit discussed

above.  D.C. Code § 48–905.02(d)(3)(A) (2012).  If no claim was filed, the city began *ex parte*

administrative proceedings in which the Property Clerk decided whether the property was subject

to forfeiture.  Id. § 48–905.02(d)(3)(C).  In Count Ten, Plaintiffs allege that the District's

forfeiture notice violated due process by failing to inform them of a "secret" proceeding where

some property owners are given an opportunity to contest the forfeiture before the Property

Clerk, notwithstanding the *ex parte* nature of the proceedings.  Compl. ¶¶ 466–69.  The District

counters that because Plaintiffs had no right to participate in the administrative proceedings, any

lack of information about an opportunity to participate could not have violated due process.  It

also argues there were no such "secret" hearings.  According to the District, any interaction

between owners and the Property Clerk would occur only through investigatory interviews

conducted by the Property Clerk as part of the *ex parte* forfeiture determination.

       Plaintiffs root this claim in Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 14–

15 (1978), where the Supreme Court found that a public utility violated due process by failing to

inform some of its customers about procedures for disputing their bills.  Because the procedures

were not found in public documents, a customer's ability to invoke them depended on the

"vagaries of word of mouth referral."  Id. at 14 n.14 (internal quotations removed).  Memphis

<u>Light</u> thus requires the government to make known any procedures for challenging the deprivation of a private interest that are not codified or otherwise publically available.  Here, Plaintiffs allege that the Property Clerk conducts informal proceedings that influence the disposition of their property interests.  While the government's alternative explanation of the "secret" hearings sounds entirely plausible—and may well prove to be accurate—the Court at this stage must accept Plaintiffs' allegations as true.  Because Plaintiffs have sufficiently alleged the existence of such secret procedures, the District's motion to dismiss Count Ten must be denied.

### D.    Due Process in Forfeiture Determinations

Plaintiffs next challenge various aspects of the process by which the District makes its final forfeiture determinations.  They allege that the District routinely discourages and rejects bond waivers, conducts *ex parte* administrative forfeitures, and retains property that is not subject to forfeiture or needed as evidence.  The Court addresses these claims below.

### i.    Bond Requirement (Count 14)

In Count Fourteen, Plaintiffs take issue with the statutory requirement that property owners must post a bond, or obtain a bond waiver, in order to initiate judicial forfeiture proceedings.  D.C. Mun. Regs. tit. 6-A, § 806.1.  The proffered legal basis for this claim is somewhat muddled.  The complaint alleges that "making claimants pay [a] bond set by MPD to obtain access to a judicial forfeiture proceeding violates the [E]qual [P]rotection [C]lause of the Fifth Amendment."  Compl. ¶ 516.  It also contends that "[a]s a general rule the Property Clerk never grants applications for waivers or reductions," <u>id.</u> ¶ 515, and that two Plaintiffs were unreasonably denied waivers, <u>id.</u> ¶¶ 215, 261.  Plaintiffs add in their opposition brief that the bond requirement "also violates procedural due process as well as substantive due process

because the Property Clerk . . . holds the key to the courthouse door." Pls.' Opp'n to Mot. to

Dismiss at 53. Based on these allegations, the Court construes Plaintiffs' claim as both a facial

challenge to the constitutionality of the bond requirement and an as-applied challenge to MPD's

implementation of it with respect to the Plaintiffs who contend they were discouraged from

seeking waivers or were unreasonably denied them.

Conditioning access to the courts on posting a bond or paying a filing fee implicates

multiple constitutional protections. Due process "'prohibit[s] a State from denying, solely

because of inability to pay, access to its courts'" when a judicial proceeding is necessary to

vindicate a fundamental right. M.L.B. v. S.L.J., 519 U.S. 102, 113 (1996) (quoting Boddie v.

Connecticut, 401 U.S. 371, 374 (1971)). And equal protection demands that access to a judicial

proceeding "cannot be granted to some litigants and capriciously or arbitrarily denied to others."

Lindsey v. Normet, 405 U.S. 56, 77 (1972). The Supreme Court's decisions on access to the

courts therefore "reflect both equal protection and due process concerns." M.L.B., 519 U.S. at

120. Applying that blended analysis, a mandatory bond requirement in a forfeiture statute is

"'unconstitutional with respect to indigent persons on due process and equal protection

grounds'" because it has the effect of depriving those individuals of their only opportunity to

exercise a fundamental right—the right to contest a property seizure. Tourus Records, Inc., v.

Drug Enforcement Admin., 259 F.3d 731, 736 (D.C. Cir. 2001) (quoting 45 Fed. Reg. 84,993,

84,993 (Dec. 24, 1980)); see also In re Williams, 628 F. Supp. 171, 173 (E.D.N.Y. 1986) ("In

forma pauperis provisions [in a forfeiture statute] are thus constitutionally mandated for the

indigent.") (citing Wiren v. Eide, 542 F.2d 757, 763 (9th Cir. 1976)).

Regardless of whether a due process or equal protection rubric is used to analyze the

bond requirement here, the standard of review is the same. Indigency is not a suspect

constitutional classification, Tucker v. Branker, 142 F.3d 1294, 1300 (D.C. Cir. 1998), and so long as indigent claimants can obtain a waiver or reduction, the bond requirement does not burden their fundamental right to challenge the seizure of their property.  See id. at 1298 (holding that fees that could be reduced or paid in installments did not prevent a prisoner from filing suits alleging constitutional violations).  Here, the District's bond requirement must be waived or reduced "[u]pon a proper showing of a claimant's financial inability to give any bond or to give a bond in the required amount."  D.C. Mun. Regs. tit. 6-A, § 806.7.  As a result, Plaintiffs' facial challenge to the bond requirement is properly viewed as a challenge to an economic regulation which is subject to rational-basis review.  Tucker, 142 F.3d at 1300; see also Kelo v. City of New London, Conn., 545 U.S. 469, 490 (2005) (Kennedy, J., concurring) ("This deferential standard of review [of a public taking] echoes the rational-basis test used to review economic regulation under the Due Process and Equal Protection Clauses.").  The statute's bond requirement easily survives rational-basis review because it serves the legitimate purposes of weeding out frivolous claims and promoting summary administrative proceedings. See Faldraga v. Carnes, 674 F. Supp. 845, 849–50 (S.D. Fla. 1987) (finding a rational basis for a substantially similar bond requirement in a customs asset forfeiture statute); see also Arango v. Dep't of the Treasury, 115 F.3d 922, 929 (11th Cir. 1997) (holding that the bond requirement in the federal asset forfeiture statute was designed to promote "more efficient and less costly administrative forfeitures").  Plaintiffs therefore have not pled that the statute's bond requirement is facially unconstitutional.  The Court will dismiss Count Fourteen to the extent it is grounded on that basis.

Certain Plaintiffs also allege, however, that the MPD has unconstitutionally *applied* the bond requirement by actively discouraging claimants from seeking waivers and arbitrarily

denying applications when they are submitted.  Takia Jenkins, Steven May, and Ramona Person all claim that they were told by officers that they would never recover their property.  Compl. ¶¶ 187, 209, 236.  And Dorian Urquart alleges that an officer at the Property Clerk's office told him that he should not even apply for a bond waiver because he will lose.  Id. ¶ 259.  As noted above, bond waivers for indigent individuals are a necessary element of a constitutionally valid forfeiture system.  It follows that MPD's alleged practice of impeding bond waivers and reductions, if true, would make the District's forfeiture system unconstitutional as applied to those claimants because it denies them an opportunity to exercise their fundamental right to contest the seizure of their property.

The District responds that no constitutional violation occurred because, if the Property Clerk rejects a waiver application, a claimant may challenge the denial in a suit under the District of Columbia Administrative Procedure Act, D.C. Code § 2-510(a) ("DCAPA").  Cf. Tourus Records, 259 F.3d at 736 (reviewing the denial of a bond waiver under the federal Administrative Procedure Act.).  Based on the record before the Court, however, it is far from clear that the DCAPA provides an adequate remedy for the alleged conduct.  Putting aside the time and effort it would take an indigent claimant to litigate such a suit, some Plaintiffs allege that the Property Clerk discouraged them from filing a waiver application altogether.  In such cases, there would be no final agency action that could be challenged under the DCAPA.  For these reasons, the Court will deny the District's motion to dismiss Count Fourteen as to those Plaintiffs who have alleged that the police or the Property Clerk discouraged or arbitrarily denied their bond waiver request.

ii.   Adequacy of Administrative Forfeiture Procedures (Count 12)

In Count Twelve, Plaintiffs allege that the District's administrative forfeiture procedures for claimants who cannot or do not post a bond "violate due process because claimants do not get notice and an opportunity to present evidence of their innocent owner status and defenses to rebut presumptions or otherwise 'claim' their property before a neutral decision maker."  Pls.' Opp'n to Mot. to Dismiss at 46.  In essence, Plaintiffs object to the *ex parte* nature of the final administrative forfeiture decision.

As the District points out, however, its bifurcated forfeiture scheme—in which claimants can either compel a judicial remedy by posting a bond (or securing a bond waiver) or accept an *ex parte* administrative determination—is very similar to the federal forfeiture regime prior to the Civil Asset Forfeiture Reform Act ("CAFRA") reforms of 2000.  Reply to Mot. to Dismiss at 23–25.  It is also a common feature of existing forfeiture laws in many states.  While no court appears to have analyzed the constitutionality of this two-tier arrangement in detail, a number of courts have either concluded, or assumed without discussion, that the system satisfies due process.  E.g., Lopez v. United States, 201 F.3d 478, 480 (D.C. Cir. 2000) (assuming that federal pre-CAFRA administrative forfeiture procedures satisfy due process if the claimant was given adequate notice); United States v. Deninno, 103 F.3d 82, 85 (10th Cir. 1996) ("Facially, both [the pre-CAFRA federal] and Oklahoma state administrative forfeiture laws satisfy the requirements of due process.").

Moreover, Judge Collyer of this Court rejected a due process challenge to similar administrative forfeiture procedures contained in a statute authorizing the Drug Enforcement Agency ("DEA") to seize controlled substances that are handled in violation of DEA regulations.  Malladi Drugs & Pharm., Ltd. v. Tandy, 538 F. Supp. 2d 162 (D.D.C. 2008).  Under that statute,

a party with an interest in seized substances under a certain dollar amount can file a claim and require DEA to seek judicial forfeiture.  Id. at 163 (citing 18 U.S.C. § 983(a)(2), (3) and 19 U.S.C. § 1607(a)(1)).  If no claim is timely filed, DEA may administratively forfeit the substances by default without a hearing.  19 U.S.C. § 1609.  As an alternative to filing a claim, an interested party can file a "petition of remission" requesting the return of the seized substance as a matter of executive discretion.  28 C.F.R. § 9.3.  After determining that petitions of remission filed by the pharmaceutical suppliers from whom the substances were seized did not constitute "claims" requiring a judicial hearing, the court rejected the suppliers' argument that the lack of a hearing to challenge the default administrative forfeiture violated due process.  Because "Plaintiffs did not file a claim to compel judicial forfeiture, . . . the administrative forfeitures [were] valid and unchallengeable."  538 F. Supp. 2d at 170.  The D.C. Circuit affirmed the district court's dismissal of the complaint on the ground that the supplier "failed to exhaust its administrative remedies before [the agency] and should not now be given a second opportunity to pursue judicial forfeiture."  Malladi Drugs & Pharm., Ltd. v. Tandy, 552 F.3d 885, 887 (D.C. Cir. 2009).  The administrative forfeiture procedures at issue here provide at least as much due process, if not more, than the DEA procedures upheld in Malladi, 538 F. Supp. 2d at 170, and, as noted above, are consistent with similar provisions of the pre-CAFRA federal asset forfeiture regime.  The Court will therefore grant the District's motion to dismiss Count Twelve.

### iii.    Retention of Property not Subject to Forfeiture (Count 7)

If it determines the seized property is not subject to forfeiture, the District is required, under both the current and prior version of the statute, promptly to return it to its rightful owner.  D.C. Code § 48-905.02(d)(3)(C) (2012); Civil Asset Forfeiture Amendment Act of 2014, §

105(c)(3), 62 D.C. Reg. 1,920 (Feb. 13. 2015).  Plaintiffs claim in Count Seven that the District

has shirked this obligation by placing the onus on owners to track down their property and secure

its return.  This practice, according to Plaintiffs, violates not only the statute but due process as

well.  See Walters v. Wolf, 660 F.3d 307, 314 (8th Cir. 2011) (city violated due process by

rejecting a criminal defendant's request for his property after the underlying charges had been

dismissed); McClendon v. Rosetti, 460 F.2d 111, 116 (2d Cir. 1972) (police violated due process

by retaining money or property that was no longer needed as evidence).

      The District responds that Plaintiffs have not stated a valid claim because most of them

admit they eventually recovered their property.  What the District overlooks, however, is that an

"arbitrary taking" may have already occurred by the time Plaintiffs managed to retrieve their

property.  Fuentes, 407 U.S. at 82.  After the District determined it had no right to the property,

any ongoing retention—even if temporary—was contrary to due process.  Id. at 85; accord

Walters, 660 F.3d at 315 ("[T]he pivotal deprivation is the City's and Chief Wolf's continued

refusal to return Walters's handgun and ammunition after the St. Louis Circuit Court dismissed

[the charges].").  And Plaintiffs have alleged additional injuries from having to expend

considerable effort locating their property and convincing the city to return it.  See Compl. ¶¶

129, 133–40 (describing repeated calls and visits by Ishekebba Beckford to the MPD after the

criminal case was terminated in an effort to retrieve her car); id. ¶¶ 271–73, 280 (alleging the

U.S. Attorney's Office told Muslimah Taylor in response to her inquiries that her car was not

being held as evidence, but the city returned her vehicle only after intervention by a lawyer).

The Court therefore finds that Plaintiffs have alleged a cognizable due process violation based on

the District's purported failure to return their property when it no longer had any interest in it.

The District's motion to dismiss Count Seven will be denied.

E.      Remaining Claims

      i.      Aggregate Fifth Amendment Violations (Count 15)

The District moves to dismiss Count Fifteen—alleging that "[t]he aggregate effect of forfeiture proceedings as implemented by the MPD . . . violates the equal protection clause of the Fifth Amendment," Compl. ¶ 520—on the grounds that it is duplicative and vague.  The Court agrees that this count does not add any new factual allegations or legal theories to the Plaintiffs' other claims.  Because, as noted above, the Court will dismiss various claims that are subsumed within Count Fifteen, it will dismiss this aggregate claim as well.

      ii.      Claims of Shanita Washington and Tanisha Williams

The District contends that the claims of Shanita Washington and Tanisha Williams must be dismissed because they have failed to plead any factual allegations.  The Court agrees. Because the Complaint lacks any facts whatsoever regarding these named Plaintiffs, the Complaint will be dismissed without prejudice as to them.

      iii.      Claims of David Littlepage

Plaintiff David Littlepage has pled that his son, Terrence Thomas, owned the cash the police seized.  Compl. ¶ 342.  As a result, the District argues that Littlepage has not alleged an injury to himself and therefore lacks Article III standing.  Plaintiffs' response—that the Property Clerk refuses to entertain inquiries from Thomas about the seized cash—does not remedy Littlepage's failure to allege an injury stemming from the seized currency.  In any event, Thomas is a named plaintiff in his own right.  The Court will dismiss Littlepage's claims without prejudice.

      iv.      Claims of Kimberly Katora Brown

Kimberly Katora Brown, the first named Plaintiff, appears to be the only plaintiff whose property was forfeited after a judicial forfeiture proceeding.  Brown's 1995 Chevy Camaro was

seized following the drug arrest of an acquaintance to whom Brown claims she lent the car. Compl. ¶¶ 103–08. Brown posted a $250 bond to obtain a forfeiture hearing but says she was unable to attend subsequent hearings due to work commitments, resulting in a default judgment against her and the forfeiture of the car. Compl. ¶¶ 114, 124–26. The District contends that Brown's claims must be dismissed because, under the common law "relation back" doctrine, title to her car vested in the District at the time of the seizure and, absent a possessory interest in the car, Brown lacks standing to challenge the forfeiture.

The District finds support for the first prong of its argument in Bazuaye v. United States, 41 F. Supp. 2d 19 (D.D.C. 1999). There, the Postal Service seized $11,000 that an arrestee had on deposit with his bail bondsman. After the arrestee failed to challenge the seizure and forfeiture in the administrative proceeding, the funds were administratively forfeited. Id. at 22. Codifying the common law "relation back" doctrine, the federal statute governing the forfeiture provided that title to forfeited property "shall be deemed to vest in the United States . . . from the date of the act for which the forfeiture was incurred." 19 U.S.C. § 1609(b). The arrestee later filed a conversion claim against the United States and the government moved to dismiss. The government argued, and the court agreed, that because title to the funds had passed to the United States at the time of the seizure by operation of the statute, the plaintiff could not establish that he had a property right in the funds. 41 F. Supp. 2d at 25. Because a property interest is an essential element of the tort of conversion, the court dismissed the plaintiff's claim.

The government attempts to marry Bazuaye with cases establishing that plaintiffs ordinarily lack standing to challenge seizures of property in which they did not have an ownership interest at the time of the seizure. In United States v. Eight Million Four Hundred Forty Thousand One Hundred & Ninety Dollars ($8,440,190) in U.S. Currency, 719 F.3d 49 (1st

Cir. 2013), for example, the First Circuit held that a boat captain lacked standing to challenge the

seizure of over $8,000,000 in alleged drug money that his crew had tossed overboard because he

did not present evidence that the funds were his and the money had been abandoned in any event.

Id. at 57–59.  Lacking ownership in the property, he was not injured by its seizure.  But that is

not the case here.  Even if the subsequent forfeiture of Ms. Brown's Camaro, as a legal matter,

divested her of ownership of the car as of the time of the seizure, she still has identified an injury

stemming from the alleged due process deficiencies in the District's forfeiture procedures.

Among other things, she claims that the lack of prompt, post-seizure hearing deprived her of the

use of her car.  She thus has established standing to bring her claims.

 The government's standing argument also runs contrary to the core purposes of the Due

Process Clause.  Due process protects against "arbitrary encroachment" and seeks to minimize

"substantively unfair or mistaken deprivations."  Fuentes, 407 U.S. at 81.  It would be strange

indeed if the government could avoid constitutional review by accomplishing the very types of

deprivation the Fifth Amendment is designed to restrain.  The Court will not dismiss Ms.

Brown's remaining claims.[5]

## IV. Conclusion

 For the foregoing reasons, the Court will grant Defendant's motion to dismiss Counts

One, Two, Four, Six, Eight, Nine, Eleven, Twelve, Thirteen, Fifteen, and Sixteen.  It will grant

in part Defendant's motion to dismiss Counts Three and Fourteen, and dismiss all claims of

Plaintiffs Shanita Washington, Tanisha Williams and David Littlepage without prejudice.  The

---

[5]  Having pursued judicial forfeiture proceedings, Ms. Brown may well be collaterally estopped
from arguing that she is entitled to the return of her car.  But the Court does not understand that
to be the relief she seeks.

Court will deny the Defendant's motion in all remaining respects.  An appropriate order will

accompany this memorandum.


                                            _____
                                            CHRISTOPHER R. COOPER
                                            United States District Judge

Date:  July 21, 2015

## Appendix A:  Surviving Claims

| Claim | Remaining Plaintiffs |
|---|---|
| 1 | None |
| 2 | None |
| 3 | Kimberly Katora Brown, Ishebekka Beckford, Nickoya Hoyte, Kelly Hughes, Takia Jenkins, Steven May, Ramona Person, Dorian Urquart and Muslimah Taylor. |
| 4 | None |
| 5 | Kimberly Katora Brown, Ishebekka Beckford, Kelly Hughes, Jarrett Acey, Julius Gordon, Marilyn Langly, Terrence Thomas, Shane Lucas, Stephanie McRae, and Gregory Stewart. |
| 6 | None |
| 7 | Ishebekka Beckford, Nickoya Hoyte, Kelly Hughes, Takia Jenkins, Steven May, Ramona Person, Muslimah Taylor, Dorian Urquart, Jarrett Acey, Julius Gordon, Marilyn Langly, Terrence Thomas, Shane Lucas, Stephanie McRae, Thomas Dutka, Ann Melton, Chiquata Steele, and Gregory Stewart. |
| 8 | None |
| 9 | None |
| 10 | Kimberly Katora Brown, Nickoya Hoyte, Kelly Hughes, Steven May, Dorian Urquart, Jarrett Acey, Julius Gordon, Marilyn Langly, Terrence Thomas, Shane Lucas, Stephanie McRae, Thomas Dutka, Ann Melton, Chiquata Steele, and Gregory Stewart. |
| 11 | None |
| 12 | None |
| 13 | None |
| 14 | Takia Jenkins, Steven May, Ramona Person, and Dorian Urquart.[6] |
| 15 | None |
| 16 | None |

[6] The Complaint does not list any of these four individuals as Plaintiffs for Count 14.  The Plaintiffs who are listed in Count 14 appear to be misidentified, as numerous individuals are listed twice.