UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY KATORA BROWN, et al.<br><br>Plaintiffs,<br><br>  v.<br><br>GOVERNMENT OF THE DISTRICT OF COLUMBIA<br><br>Defendant. | Civil Action No: 13-569 (CRC) |

**PLAINTIFFS' MOTION FOR LEAVE TO TAKE A 30(b)(6) DEPOSITION**

Plaintiffs respectfully move this Court for leave to take a 30(b)(6) deposition on the topics of the "data export" (export of records and other data from and relating to selected fields in EvidenceOnQ, the District's property and evidence database) and related documents (including the Electronic Documents[1]) which the District produced in discovery.

The District produced the "data export" May 12, 2016 which was two months **after** the 30(b)(6) deposition Plaintiffs took on March 1, 2016.

The production of the Electronic Documents is ongoing.

---

[1] The "Electronic Documents" are pdf versions of the paperwork generated in connection with a particular seizure such as the PD 81, the forfeiture determination showing whether a vehicle or money is subject to forfeiture, any bond waiver application.

As described in more detail below the 30(b)(6) deposition Plaintiffs took on March 1, 2016 was on different topics related to the architecture of EvidenceOnQ.

The proposed 30(b)(6) deposition is for Plaintiffs to get the District to "interpret" the "data export" and related documents such as the Electronic Documents and a data dictionary produced by the District. La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 486 (N.D. Cal. 2012) *citing* United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996)(in a 30(b)(6) deposition corporation must provide its interpretation of documents). Plaintiffs want to depose a 30(b)(6) designee as opposed to individuals to get the District's interpretation of documents which will be binding on the District as the District's testimony. La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 486 (N.D. Cal. 2012) *citing* United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996)(in a 30(b)(6) deposition corporation must provide its interpretation of documents).

**Reason for motion.**

At the telephone conference with the Court on October 18, 2016 when plaintiffs stated they wanted to take a 30(b)(6) deposition on the data export and related documents the District objected and the Court ordered plaintiffs to file a motion if they wanted to take a 30(b)(6) deposition. Plaintiffs have completed their analysis of the documents that the District has produced and Plaintiffs have reviewed the District's responses to their interrogatories and attempted to get more complete responses and Plaintiffs are ready to depose the District's designee to interpret the data export and related documents.

Presumably, the basis for the District's objection to a 30(b)(6) deposition on the EvidenceOnQ data export is Rule 30(a)(2) which states that the Court must grant leave, to the

extent consistent with Rule 26(b)(2), to conduct a deposition of an individual who has already once been deposed. <u>Forsythe Racing Team, Inc. v. Player's Co.</u>, 2008 U.S. Dist. LEXIS 35685, at *5-6 (S.D. Ind. Apr. 30, 2008).

Rule 26(b)(2)(C) permits the Court to limit discovery if it determines that the discovery sought (1) is cumulative or duplicative, or can be obtained from a more convenient, less burdensome or less expensive source; (2) the party seeking the discovery has had ample opportunity to obtain the information during discovery; or (3) the burden or expense of the proposed discovery outweighs the likely benefit. <u>Forsythe Racing Team, Inc. v. Player's Co.</u>, 2008 U.S. Dist. LEXIS 35685, at *5-6 (S.D. Ind. Apr. 30, 2008).

Neither Rule 30(a)(2) not Rule 26(b)(2)(C) precludes Plaintiffs' proposed 30(b)(6) deposition.

The 30(b)(6) deposition plaintiffs propose is not a "deposition of an individual who has already once been deposed" under Rule 30(a)(2).

But, assuming that it is, the deposition plaintiffs propose satisfies the criteria in Rule 26(b)(2)(C).

**Plaintiffs' Claim 3.**

Plaintiffs' Claim 3 has three data points: (1) Seizure Date; (2) Hearing Date; and (3) Release Date. These three data points enable plaintiffs to determine whether, and for how long, a vehicle was over-detained.

The Seizure Date for vehicles seized within the class period is the date the District took the vehicle. The Seizure Date for "overlap" cars (vehicles seized before the start of the class period but disposed of during the class period) is the same for all "overlap" cars, the first day of the class period, April 25, 2010.

The Release Date marks the end-date of an over-detention period. Calculating the Release Date depends on (1) the disposition date, and (2) the disposition type. The disposition date is the date the District "disposed" of a vehicle or currency.[2] The disposition type refers to how the District disposed of property such as by returning the property to the owner, judicially forfeiting the property, or even retaining the property.

The easiest type of Release Date to calculate is when the District returned a car to an owner. In this type of disposition, the Release Date is simply the return date. For example, the District gave named plaintiff Mr. May his car back on 10/16/2012. That is the Release Date for his car. Sometimes, the District never gave a car back. For example, the District forfeited Ms. Brown's car in a judicial forfeiture proceeding and so the end of her over-detention period is the date the forfeiture decree was entered. In her case, the Release Date is the date the forfeiture decree was entered. The District still has many cars on its lot at Blue Plains. The Release Dates for those vehicles is a point between the effective date of the amendment of the District's civil forfeiture statute (June 15, 2015) and the date of resolution of the case.

---

[2] The disposition date and the disposition type for each piece of property seized by the District is also in the "property book." The Property Clerk statute requires the Property Clerk to maintain a "book" recording a list of property seized by the District including the names of the persons from whom property or money was taken, the date of the seizure, the general circumstances connected with the seizure, and **"any final disposal of such property and money."** D.C. Code § 5-119.03.

Plaintiffs believe that these three data points are in EvidenceOnQ.

**Plaintiffs' discovery efforts for EvidenceOnQ as to vehicles.**

Plaintiffs have takenobtained most of the discovery they need on EvidenceOnQ and the EvidenceOnQ data export as to vehicles. The District has produced most of the documents.

To obtain this information about EvidenceOnQ and these three data points EvidenceOnQ plaintiffs propounded document production requests to the District on about 11/12/2015 asking for records in EvidenceOnQ for the relevant period, EvidenceOnQ manuals, a EvidenceOnQ data dictionary, and other documents. Plaintiffs focused on EvidenceOnQ because EvidenceOnQ is the only source of documents the District disclosed in its initial disclosures. Rule 26(a)(1)(A)(ii)(a copy — or a description by category and location — of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment).

The document production requests asked (among other things) for all EvidenceOnQ manuals and a data dictionary. Plaintiffs asked for manuals to learn what data the District stored in EvidenceOnQ and to learn how to interpret the data in EvidenceOnQ. The first step in the EvidenceOnQ discovery was to learn which fields in EvidenceOnQ plaintiffs actually needed records and data from. Plaintiffs did not need every single field for the vehicle claims and the other claims, only the fields relating to whether a vehicle was over-detained and related fields such as why the property was seized (e.g., possession of marijuana, transport of a weapon). Plaintiffs also need to know the function of each field they receive records from.

A data dictionary is needed to interpret the data in EvidenceOnQ because every field in a database has two names: (1) the "screen name" which is the name the data entry person sees when they enter the property in the database; and (2) the programmer name which is the name the programmer and "tech" people use to discuss the "fields" in the database. A typical example is "name." The screen name will be first name, middle name, last name. The programmer name will be something like "nam_f," nam_m," "nam_l." The correspondence between the screen name and the programmer names are pretty self-evident in this example but that is not always the case. A data dictionary functions as a "Rosetta Stone," a key that allows a person to decipher the meaning of field names whether expressed as screen names or expressed as programmer names.

One practical use of the data dictionary is during a deposition of a user of EvidenceOnQ one can ask what fields the user populates when they enter data about a property into EvidenceOnQ. A data entry person will know the screen name but typically will not know the programmer name. Another need for a data dictionary is that databases have "autopopulate fields," that is, a field which automatically enters "time stamp" showing the date and time a field is populated. This can show the Seizure Data because whenever the data entry person types in the type of property a "time stamp" showing the date and time is generated in a related field.  Another feature of a data dictionary is it provides the menus for the "drop down" menus. Many fields present a menu of choices. For example, a "type of property" field might have a drop down menu from which the user can select "car" "money" boat, etc. The field plaintiffs believe is the disposition type field in EvidenceOnQ uses a drop down menu (release to owner, Blue Plains, Row 11, etc.).

On about January 21, 2016 the District produced written responses to Plaintiffs' document production requests but no data. In response to plaintiffs document production request for a data dictionary the District responded "No responsive documents."

Through "meet and confers" Mr. Borden negotiated for the production of a manual for EvidenceOnQ. The District produced the EvidenceOnQ user's manual ("EvidenceOnQ Desktop User Guide") on February 26, 2015. The user manual explains how EvidenceOnQ works from a data entry person's point of view. It uses screen names and "screen shots" (pictures of the screen the user sees when entering data) to explain how EvidenceOnQ works.

Plaintiffs noticed a 30(b)(6) deposition for someone to explain the basics of EvidenceOnQ so the parties could narrow the list of fields plaintiffs needed.

At the early stages of database discovery, in an effort to speed up discovery and to reduce the burden on the parties, the requesting party to some extent has to rely on the producing party's superior knowledge of its database to decide which fields to get records from. Carr v. State Farm Mut. Auto. Ins., 312 F.R.D. 459, 467 (N.D. Tex. 2015)(producing party ordinarily has far better information - perhaps the only information - with respect to its system and the burdens of producing data from it). Here the District possessed all the information about EvidenceOnQ and how it works and plaintiffs had no way to access that information except through the District. John B. v. Goetz, 879 F. Supp. 2d 787, 887 (M.D. Tenn. 2010).

The practice is to stage discovery in phases. The first phase is to learn the basics and get the data export and related documents. The second stage is to analyze the data export and related documents and then to take follow up discovery to interpret the data export and related documents and to get admissions about the information the parties negotiated.

After negotiation among the parties and a call to the Court for assistance in getting a deposition date the District produced Mr. Carter on March 1, 2016. Mr. Borden walked Mr. Carter through the manual and Mr. Carter provided very useful information which enabled Plaintiffs to interpret the manual. This information allowed plaintiffs to negotiate with defendant the fields plaintiffs needed from EvidenceOnQ.

Mr. Borden asked Mr. Carter about a data dictionary and Mr. Carter did not know about it.

Based on the information obtained in the database Mr. Borden and Mr. Amarillas discussed the fields in EvidenceOnQ and negotiated a list of fields the District would produce. The District also provided a list of fields the District proposed to omit and the parties agreed to omit those fields from the data export.

On about March 21, 2016 the District produced a data export of all records from an agreed on list of fields from roughly the class period (April 1, 2010 to date of production).

The data export was in an Excel spreadsheet and Plaintiffs believed that each column in the spreadsheet reflected a field in EvidenceOnQ.[3] The field names in the spreadsheet were programmer names. As stated above, the field names in the user manual the District produced were screen names.

For example, the first field was FolderBarcode, a unique identifier for each property. Another field was "CurrentLocationName." Another was "FolderMoveDate." As is apparent from

---

[3] As explained below, the District has subsequently explained in an interrogatory response that the data in the "FolderMoveDate" column in the spreadsheet is not strictly speaking a "field" in EvidenceOnQ. It is a "date and time stamp" that indicates when a certain field in EvidenceOnQ, Plaintiffs believe the CurrentLocationField, is populated.

the field names, the field names in the data export were programmer names. So, plaintiffs needed a data dictionary to serve as a "key" or a Rosetta Stone to translate programmer names into screen names and vice versa.

The District did provide with the data export an Excel spreadsheet called "EvidenceOnQ fields" which had three columns: (1) a column for programmer names ("FieldNames"), (2) a column for screen names ("Caption"), and (3) a third column for "Prompts," which are the instructions the data entry person sees on what information should be put into that field. Before the Carter 30(b)(6) on deposition March 1, 2016 the District's response to plaintiffs' request for a data dictionary was "no responsive documents."

But, "EvidenceOnQ fields" spreadsheet, which is somewhat like a data dictionary, had limited utility because it omitted certain fields from the data export such as CurrentLocationName and FolderMoveDate which, as it turns out, are key fields or columns in the data export for calculating the disposition date and the disposition type, and thus the Release Date. The list also included certain fields from the list of fields the District said it intended to omit.

Plaintiffs began their analysis of the data export using the Carter deposition, the EvidenceOnQ manual, and the incomplete data dictionary to interpret the data. For example, in his deposition Mr. Carter explained that RecoveryDate in the data export corresponded with the "Seizure Date," the date the vehicle was seized by the District for a forfeiture determination.

On June 15, 2016 the District began to produce the "Electronic Documents" on a rolling basis.

Plaintiffs' data analysis experts began analyzing the Electronic Documents. The Electronic Documents helped plaintiffs understand the data in the data export of EvidenceOnQ data.

Using the limited data dictionary and the other materials plaintiffs were able to reach a working hypothesis that:

| Programmer name | Screen name | Meaning |
| --- | --- | --- |
| RecoveryDate | | Seizure Date |
| CurrentLocationName | | Disposition type (e.g., return to owner, sale at auction, still on Blue Plains lot) |
| FolderMoveDate | | Disposition date (needed to calculate Release Date) |

In order to obtain the screen names and to confirm this working hypothesis and to get the information in the form of an admission that they can use at the summary judgment stage, plaintiffs discussed the issue with opposing counsel in several meet and confers. Plaintiffs were unable to get the needed admissions from opposing counsel.

On 10/7/2016 plaintiffs propounded three pinpoint interrogatories to the District seeking information about specific fields in the data export and asking for the Seizure Date, and the disposition date, and the disposition type for each vehicle.

Plaintiffs asked for information about disposition date and disposition type because, as explained above, the disposition type dictates how to calculate the Release Date for different types of dispositions.

Plaintiffs' Interrogatory # 1 read:

**Interrogatory # 1.** With respect to each vehicle ... please state the date on which the District seized the vehicle and the date on which the District finally disposed of the vehicle and how the District finally disposed of the vehicle (for example, by retaining the vehicle, selling it, returning it to the owner, judicially forfeiting the vehicle). "Finally disposed" herein has the same meaning that it does in D.C. Code § 5-119.03.

On 11/7/2016 the District's substantive response was:

... the District directs plaintiffs to [the data export]. The responsive information is contained under the "RecoveryDate," "FolderMoveDate," and "CurrentLocationName" columns.

Interrogatory # 1[4]. This response is non-responsive to Plaintiffs' interrogatory. The interrogatory asked the District for information about two data points, disposition date, and disposition type. Instead of providing the **two** data points the plaintiffs asked for, the District referred plaintiffs to **three** fields in the data export without telling plaintiffs the rules for figuring out which field supplies the disposition date, or which field supplies the disposition type. This is some type of hybrid Rule 33(d) response. The District referred to documents but the documents were not completely understandable to Plaintiffs and the District provided some but not enough instructions.

Plaintiffs were able to glean some information from the response which suggests that their working hypothesis regarding how to calculate the Release Date from the EvidenceOnQ data export is correct. But, plaintiffs need to pin the District down on these issues both to understand the data export and to get admissions.

---

[4] Plaintiffs address the District's objection that the interrogatory is burdensome in another motion, Plaintiffs' to Compel Interrogatory responses.

A major question is whether the sequence of the three fields the District provides is meaningful. That is, does the first field refer to the first data point plaintiffs sought information about? It might. Does the second field refer to the second data point plaintiffs sought information about? Maybe. But to use the data to survive summary judgment plaintiffs need more than a maybe.

Plaintiffs also asked defendant the following interrogatory:

**Interrogatory # 3.** Please explain the function of the field in EvidenceOnQ called "folder move" and explain how the District's agents used the field.

**Response:** ... the District states that there is no field in EvidenceOnQ called "folder move." To the extent this Interrogatory purports to seek information relating to the "FolderMoveDate" column identified in response to Interrogatory Number 1 above, the District states that the "FolderMoveDate" column indicates the last date the property was transferred, as reflected in EvidenceOnQ.

Again, the response provides some information but the response is not complete. Follow up questions are required. For example, what does the phrase "the last date the property was transferred, as reflected in EvidenceOnQ" mean? What does the key word "transfer" mean? Is this a term of art as used in EvidenceOnQ, or a general term whose meaning should be supplied by a dictionary? If FolderMoveDate is a "time stamp" record automatically generated by EvidenceOnQ when a particular field is populated what is the name of that field?

Plaintiffs need a 30(b)(6) deposition to obtain additional information about these fields and records and how they work, and to obtain admissions for dispositive motions.

The topics plaintiffs need for the 30(b)(6) deposition include:

➢ The screen names for the fields on the data export which were omitted from the list of fields in EvidenceOnQ;

- ➢ Options on the drop down menus used to populate fields in the EvidenceOnQ data export;

- ➢ The function of the major fields on the data export such as CurrentLocationName and FolderMoveDate;

**Neither Rule 30(a)(2) nor Rule 26(b)(2)(C) precludes Plaintiffs' proposed 30(b)(6) deposition.**

Neither Rule 30(a)(2) nor Rule 26(b)(2)(C) precludes Plaintiffs' proposed 30(b)(6) deposition.

The 30(b)(6) deposition plaintiffs propose is not a "deposition of an individual who has already once been deposed" under Rule 30(a)(2).

But, assuming that it is, the deposition plaintiffs propose satisfies the criteria in Rule 26(b)(2)(C).

**Rule 30(a)(2): does a 30(b)(6) of a PMK ("person most knowledgeable") about the data export from EvidenceOnQ and the fields and the incomplete data dictionary constitute a "deposition of an individual who has already once been deposed."**

First, the manual the District provided in advance of the Jerrell Carter deposition and on which Mr. Borden based his deposition used screen names to describe the workings of EvidenceOnQ. The District did not indicate on its written responses a list of manuals it was withholding so plaintiffs believed that this was the only responsive manual. The data export the District provided used programmer names.

Therefore, Plaintiffs need a data dictionary as a Rosetta Stone to decipher the programmer names. Second, at the time of the deposition, the District effectively told plaintiffs in is response to plaintiffs' document production request that it did not have a data dictionary. Therefore Mr. Borden did not have a list of programmer names he could ask Mr. Carter about. Third, Mr. Borden's purpose was to confirm that EvidenceOnQ was a relational database (a point the District's counsel was effectively disputing at this point) and to get a list of fields that would provide the plaintiffs the information they would need from EvidenceOnQ. Plaintiffs never intended that this deposition was the be-all and the end-all of depositions about data exports from EvidenceOnQ. Fourth, now that plaintiffs have received the data export they have to ask questions about it and get the District to interpret the data export. Fifth, having received an incomplete data dictionary after Mr. Carter's deposition after the District said it did not have one plaintiffs need to depose a 30(b)(6) deponent on the data dictionary the District has provided and the field names omitted from the data dictionary (e.g., FolderMoveDate, CurrentLocationName) on it and the fields listed on it that the District did not produce.

**Even if plaintiffs are proposing a "deposition of an individual who has already once been deposed" under Rule 30(a)(2), plaintiffs satisfy Rule 26(b)(2)(C).**

Rule 26(b)(2)(C) permits the Court to limit discovery if it determines that the discovery sought (1) is cumulative or duplicative, or can be obtained from a more convenient, less burdensome or less expensive source; (2) the party seeking the discovery has had ample opportunity to obtain the information during discovery; or (3) the burden or expense of the proposed discovery outweighs the likely benefit. Forsythe Racing Team, Inc. v. Player's Co., 2008 U.S. Dist. LEXIS 35685, at *5-6 (S.D. Ind. Apr. 30, 2008).

**Proposed 30(b)(6) deposition is not *unreasonably* duplicative".** Plaintiffs' proposed 30(b)(6) deposition is not *unreasonably* duplicative;" Plaintiffs have not had ample opportunity to obtain the information during discovery; and the burden or expense of the proposed discovery outweighs the likely benefit.

The real question is not whether a deposition or the deposition topics are duplicative but whether they are "*unreasonably* duplicative." La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 487 (N.D. Cal. 2012)(emphasis in original). Plaintiffs establish above that the topics of the proposed deposition are not even duplicative. The first deposition was based on a user manual which used screen names at a time when the District said it did not have a data dictionary. This deposition is about the District's data export from EvidenceOnQ which uses programmer names to describe the records in the data export and the incomplete data dictionary the District produced.

The purpose of this 30(b)(6) deposition is to get the District to interpret documents which it produced after the first 30(b)(6) deposition.

In fact, the District in its interrogatory response stated that the EvidenceOnQ data in the FolderMoveDate column of the data export is not even a field. It is data auto-populated by EvidenceOnQ. So, populating some field in EvidenceOnQ "auto-populates" the FolderMoveDate column in the data export with a "time stamp." It was not discussed in the user manual. The District did not produce a data dictionary before the Carter deposition. And the FolderMoveDate is not listed on the incomplete data dictionary the District produced to plaintiffs after the Carter deposition.

Plaintiffs need to know populating which field generates the data in the FolderMoveDate column.

Moreover, one of the purposes of a 30(b)(6) is for a corporation to provide its interpretation of documents. La. Pac. Corp., 285 F.R.D. at 486 *citing* United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996)(in a 30(b)(6) deposition corporation must provide its interpretation of documents). Plaintiffs need the District to explain two documents it produced after the Jerrell Carter deposition, the data export and the incomplete data dictionary.

Plaintiff is entitled to the knowledge of the corporation and the corporation's positions on matters relevant to plaintiffs and defendant's defenses. Testimony provided by employees as individuals does not satisfy the need for Plaintiffs to obtain binding testimony from the corporate entity. La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 487 (N.D. Cal. 2012).

**Plaintiffs have not had ample opportunity to obtain the information during discovery in a way that precludes this discovery.** Time-wise, it has been a long time since the discovery period began. But, viewed functionally, it has not been a long time since the District produced the responsive documents to plaintiffs' requests.

As Mr. Borden's chronology (attached as Ex. A) makes clear, plaintiffs have been diligent in obtaining the discovery (data export from EvidenceOnQ and the incomplete data dictionary) and analyzing it.  Plaintiffs propounded their document production requests on 11/20/2015, just a month after the discovery period began. Mr. Borden's chronology shows that he has in good faith held numerous meet and confers with the District to obtain the information in a form that is

admissible in support of motions and at trial. Plaintiffs also attempted to keep the Court notified about discovery issues in the text of their motions to extend the discovery period.

Plaintiffs have spent more than 700 hours analyzing and interpreting the data export and related documents only to come to this point where more information is needed. Plaintiffs also attempted to obtain the information through interrogatories but the District's responses did not produce the information.

**The likely benefit of the proposed discovery outweighs the burden or expense.**

Plaintiffs could obtain the information and admissions they seek by deposing individuals. This would be inefficient because who is the "PMK" (person most knowledgeable) is solely within the District's knowledge and Plaintiffs could waste both parties' time and money chasing that PMK.

Moreover, a 30(b)(6) deposition provides Plaintiffs' with the District's admissions as a party. Plaintiff is entitled to the knowledge of the corporation and the corporation's positions on matters relevant to plaintiffs and defendant's defenses. Testimony provided by employees as individuals does not satisfy the need for Plaintiffs to obtain binding testimony from the corporate entity. La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 487 (N.D. Cal. 2012).

Rule 26(b)(1), which defines the scope of discoverable information defines discoverable information as that which is (1) non-privileged, (2) relevant to a claim or defense, and (3) "proportional to the needs of the case." Proportional to the needs of the case requires analyzing the request and response in light of the following six factors:

1. issues at stake in the action,

2. the amount in controversy,

3. the parties' relative access to relevant information,

4. the parties' resources,

5. the importance of the discovery in resolving the issues, and

6. whether the burden or expense of the proposed discovery outweighs its likely benefit.[5] John B. v. Goetz, 879 F. Supp. 2d 787, 887 (M.D. Tenn. 2010).

Attorneys asserting a proportionality objection should address the six proportionality factors with specific factual information, to the extent known, such that the requesting party (and the court if necessary) can make a determination regarding the validity of the objection. This is because "A party claiming undue burden or expense ordinarily has far better information - perhaps the only information - with respect to that part of the determination." Carr v. State Farm Mut. Auto. Ins., 312 F.R.D. 459, 467 (N.D. Tex. 2015). Here the District possesses all the data and plaintiffs have no way to access it except through the District. John B. v. Goetz, 879 F. Supp. 2d 787, 887 (M.D. Tenn. 2010).

Plaintiffs do not know what if any burdensome objection the District might make but producing a designee to answer questions about documents (data export from EvidenceOnQ and the incomplete data dictionary) the District produced after the Carter deposition is not

---

[5] Although this amendment looks like a paradigm shift, it changes the scope of discovery only slightly. All but one of the proportionality factors formerly appeared in Rule 26(b)(2)(C)(iii) as criteria for limiting unduly burdensome discovery. Because former Rule 26(b)(1) stated that "[a]ll discovery [was] subject to" those criteria, proportionality already defined the outer limits of discovery. The amendment simply puts proportionality directly in Rule 26(b)(1)'s definition, which is where the concept was first introduced in 1983. Feature: Changes To Federal Civil Practice In South Carolina, 28 S. Carolina Lawyer 26, 28

burdensome under a proportionality analysis. The proportionality considerations weigh in favor of Plaintiffs. Here, the District possesses all the data and plaintiffs have no way to access it except through the District, and asymmetrical knowledge carries great weight in the proportionality analysis. John B. v. Goetz, 879 F. Supp. 2d 787, 887 (M.D. Tenn. 2010). The requested data points are key to the issues at stake in the action; the amount in controversy, estimated at $100 per car per day, is considerable; the parties' relative access to relevant information is asymmetrical – the District has sole access to the data; the District has superior resources; the discovery is key in resolving the issues in Claim 3; and, the benefits of the proposed discovery outweighs its burden or expense because the District already has the data.

Respectfully submitted,

| /s/William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579<br><br>Counsel for Named Plaintiffs<br>2020 Pennsylvania Ave., N.W.<br>#395<br>Washington, DC 20006<br>Phone 202/824-0700<br>Email claibornelaw@gmail.com | /s/ Bennett Borden<br>BENNETT BORDEN<br>D.C. Bar # 501228<br><br>Counsel for Named Plaintiffs<br>1500 K Street, N.W.,<br>Ste. 1100<br>Washington, DC 20005-1209<br>Phone (202) 842-8800 phone<br>Fax (202) 842-8465 |
|---|---|
| /s/ Lynn E. Cunningham<br>LYNN E. CUNNINGHAM<br>D.C. Bar # 221598<br>Counsel for named plaintiffs<br><br>P.O. Box 1547<br>Dubois, WY  82513<br>307-455-3374  (landline)<br>307-431-4158 (cell) | |