# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

KIMBERLY KATORA BROWN, et al.

Plaintiffs,

v.

GOVERNMENT OF THE DISTRICT OF COLUMBIA

Defendant.

Civil Action No: **13-569 (CRC)**

---

## AFFIDAVIT OF BENNET BORDEN REGARDING POST DISCOVERY ANALYSIS OF EVIDENCEONQUE DATA AND ELECTRONIC DOCUMENTS

1.      My name is Bennett B. Borden and I am a Partner at Drinker Biddle & Reath, LLP, its Chief Data Scientist and Chair of its Information Governance and eDiscovery practice group. I am Chair of the Cloud Computing Committee and Vice-chair of the Internet of Things and the Electronic Discovery and Digital Evidence Committees of the Science and Technology Section of the American Bar Association.  I am also a member of the National Conference of Lawyers and Scientists of the American Association for the Advancement of Science.  I have been a member of Working Group 1 of The Sedona Conference for 12 years and have been on the drafting committees of several of its publications including The Cooperation Proclamation. I hold a J.D. from Georgetown University Law Center and an M.S. in Data Analytics from New York University.

2.      As Discovery Counsel in this matter, I and my team at Drinker Biddle & Reath, LLP (DBR) have been primarily responsible for obtaining and analyzing documents and data from the Defendant DC Metropolitan Police Department (MPD).  Over the past year, we have spent significant time and effort diligently working to interpret and draw meaning from the data produced by the MPD related to property it seized as evidence of for civil forfeiture.

3.      The MPD productions included data exported from the EvidenceOnQ (EoQ) database, which it uses to track seized property as well as PDFs of scanned hard copy documents ("Electronic Documents").  The data production comprised four large exports in the form of comma separated value (csv) files.  The MPD also made several productions of PDF versions of hardcopy documents.   Through extensive technical and analytical efforts and time-consuming manual analysis and data entry, in addition to exhaustive conversations with the MPD, supplemental interrogatories, and depositions, we have a clearer, though not final, understanding of the vast and inconsistent information produced by the MPD.

4.      Initially, the MPD provided 3 data exports from EoQ that included more than 964,480 fields of data (10,961 rows x 88 columns in one data export alone).   This initial production also included scanned hardcopy documents of varying quality, with some pages obscured or otherwise illegible, and containing many handwritten notes.  These PDFs were not readily searchable. We spent a great deal of effort trying to understand the extensive fields of data and manually reviewing the information in the PDFs.  There was no direct association or relation between the fields of data and the information in the PDFs.   A brief summary of these efforts are discussed below.

Ps. Ex. # A, p. 2
Brown v. DC, 13-569 (CRC)

5.      As stated, we received over 964,000 fields of data that were not easily understood

or organized.  This data was also not easily associated with specific items of property seized and

more than one data record was associated with a single item of property.  Additionally, the data

included field names lacking a logical nomenclature explaining the field contents.  For example,

it was not readily evident which field identified the disposition date of an item of property, a

significant evidentiary issue in this matter.

6.      We spent hundreds of hours assessing the data to identify key information related

to seizures to include the disposition dates and type of seizure associated with each item of

property. We repeatedly conferred with the MPD to try to obtain more information about how to

interpret the data. In our conversations, it became clear that the MPD also did not understand the

contents of its data export.

7.      Through our substantial analysis of the data export, it was apparent that key data

specifically reflected in the scanned hardcopy PDFs such as PD81s and PD81-Cs had not been

recorded in EoQ.  In turn, this data was not included in the data exports.  The MPD represented

that it had produced all relevant documents out of EoQ during its initial productions in the

middle of 2016.  To gather key information suspected to reside in the PDFs, we turned to what

limited PDFs were produced during the initial productions.

8.      We spent several hundred hours analyzing the information in the PDFs.  This

included a detailed document-by-document and page-by-page review.  It involved extensive

manual data entry to capture key information contained in each document critical to mapping out

the history of each item of property and its disposition, where this information was present, and

identify where data from EoQ was not produced within the data export for specific pieces of

property. Through this analysis we revealed that the MPD had not produced all of the relevant

hardcopy documents, given the significant number of items of property in the data exports that had no associated PDFs produced.

9.     Our extensive analysis and ability to demonstrate the failure to produce all relevant data out of EoQ and related PDFs led to the additional production of data and PDF documents by the MPD.  After receiving this additional data export and PDF production, our extensive and time consuming analysis resumed.

10.     This did not resolve the outstanding questions concerning what specific fields in the data exports meant.  Only after multiple conversations with the MPD, the serving of additional interrogatories, and an additional 36(b) deposition were we able to understand what each field in the data export meant, and thus be able to track each item of property from seizure to disposition.   This was critical information that delayed the progress of our efforts to interpret the MPDs productions for more than nine months.

11.     Additional and extensive analysis was required to identify vehicles seized for evidence and those seized for civil forfeiture.  It was even more difficult to identify property initially seized for evidence, but then later reclassified as held for civil forfeiture. This analysis relied heavily on the significant manual data entry we performed during the time-intensive review of the PDFs produced in multiple waves.  We carefully identified the presence of PD81s and PD81-Cs buried within a single PDF, if present.  This included identifying whether proper notations were made stating whether property was seized originally as evidence and/or subsequently reclassified as a civil forfeiture.  Again, of note, the data found in the PDFs was not always consistently transferred from the paper documents into EoQ by the MPD.   Also, as noted above, the PDFs were of limited clarity and not searchable.  Therefore, they lacked the complete

picture of a vehicle's evidentiary history.  We captured what was available through more than 400 hours of manual data entry, described above.

12.     In sum, we have spent more than a year diligently analyzing the confusing, incomplete and incongruous data and documents produced by the MPD, expending more than 1,000 hours doing so.  To finally gain an understanding of the productions required extensive conferences with the MPD, calls to the Court, the serving of interrogatories and our conducting two 30(b)(6) depositions.  Our analysis of the production was not fully complete until last week.

13.     In the last three months my team and I have focused on analyzing the data in EvidenceOnQue and analyzing the Electronic Documents (that is, the pdf documents associated with seized vehicles and seizures of currency) to see how the MPD "classified" the property on the PD81s and in the EvidenceOnQue data. We also identified each warrant associated with a vehicle and analyzed it to see why the warrant was issued (e.g., to search for items in the vehicles or to process the vehicle for evidence such as fingerprints) and how long it took the MPD to execute the warrant.

14.     We conducted sampling of the Electronic Documents associated with about 960 of the vehicles to see how the MPD "classified" the property on the PD81s and in the EvidenceOnQue data.

15.     We also examined the EvidenceOnQue and sampled the Electronic Documents looking for documents (such as emails or data entries) indicating that the USAO (as opposed to the MPD) had directed the seizure or retention of any vehicles.

I, Bennett B. Borden, pursuant to 28 U.S.C. §1746, state under penalty of perjury that the foregoing is true and correct.

Executed on 6/12/2017, in Washington, DC.

/s/ Bennett Borden
BENNETT BORDEN
D.C. Bar # 501228

Counsel for Named Plaintiffs
1500 K Street, N.W.,
Ste. 1100
Washington, DC 20005-1209
Phone (202) 842-8800 phone
Fax (202) 842-8465

Ps. Ex. # A, p. 6
Brown v. DC, 13-569 (CRC)