# EXHIBITS 328 to 337

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KIMBERLY KATORA BROWN, et al. | ) | |
| | ) | |
| | ) | Civil Action No. 13-569 (KBJ) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GOVERNMENT OF THE DISTRICT OF | ) | |
| COLUMBIA | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF KIMBERLY KATORA BROWN

I, Kimberly Katora Brown, pursuant to 28 U.S.C. § 1746, certify as true under penalty of perjury under the laws of the United States of America that the following is true and correct.

1.     I am a life-long resident of the area and at the time of the events described herein I was a resident of Maryland.

2.     As of 4/25/2010 owned a 1995 Chevrolet Camaro which my Dad and helped me to select (though I paid for it) and had helped me fix up.

3.     The Chevrolet Camaro was titled and registered in my name in Maryland, and had legal tags on the front and the back of the car as required by Maryland law.  The windows were tinted but were in compliance with Maryland law and District of Columbia law.

Brown 000001

Ps. Ex. 328, p. 1
Kimberly KaTora Brown Affidavit
Hoyte v. D.C., 13-569 (CRC)

4.      On the morning of 4/25/2010 I lent my Camaro to a friend, Darrell C. Hammond, so he

could pick up his son and run some errands.

5.      Later in the afternoon on 4/25/2010 the MPD stopped the Camaro in the 1300 block of

Florida Ave., N.E., because, they claim, the tinted windows violated District of Columbia law

and the Camaro did not have a front tag.

6.      This Court has found that, "Policemen looking for excuses to stop vehicles they consider

suspicious have found the District of Columbia's tinted windshield law to be a useful device,"

and that most of such stops are concentrated in the area where the MPD stopped Ms. Brown's

Camaro, and that "[t]he tint window law is as close to a purely pretextual reason for stopping

vehicles as can be found in the real world of everyday police work."  United States v. Green, 437

F. Supp. 2d 38, 40-41 (D.D.C. 2006).

7.      Based on a Complaint for Libel of Information filed by the District ("Libel of

Information"), Mr. Hammond was driving and he had a passenger with him in the car when the

MPD stopped the Camaro.

8.      Based on the Libel of Information the police discovered (1) some money on Mr.

Hammond and some more on the passenger; and (2) some ziplock bags of marijuana in a bag in

the car.

9.      The MPD arrested Mr. Hammond and the passenger and seized the car and the money for

forfeiture.

AFFIDAVIT OF KIMBERLY KATORA BROWN
PAGE 2

**Ps. Ex. 328, p. 2**
**Kimberly KaTora Brown Affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000002**

10.     The MPD seizing officers did not give Mr. Hammond a receipt for the car or any information on where to go to try to reclaim it nor did they provide any such notice to me.

11.     I personally have no knowledge whether the MPD found ziplock bags of marijuana in a bag in the car while Mr. Hammond was in it.

12.     I had no reason to know Mr. Hammond would use the car for an illegal purpose nor did I consent to his use of the car for any illegal purpose.

13.     I had no reason to know or suspect that Mr. Hammond would use of the car to transport marijuana or for any other illegal purpose.

14.     Within a few days of the seizure I went to the MPD police station on Florida Avenue (the station where Mr. Hammond was booked and the station closest to where the car was seized) and told officers there that the Camaro was my car and that I had lent it to Mr. Hammond and that I had not known or consented to any illegal use of the Camaro.

15.     After several trips to the station and many calls I discovered the car was at an impound lot.

16.     A few months after the Camaro was seized I was told to go to a lot and there I paid $250 to prevent administrative forfeiture of the Camaro.  No one at the lot told me I had an opportunity to apply for a reduction or waiver of the bond.

17.     According to court records, on 2/11/2011, almost a year after the seizure, the District filed a Libel of Information in Superior Court.

**Ps. Ex. 328, p. 3**
**Kimberly KaTora Brown Affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000003**

18.     The Libel of Information alleged that Mr. Hammond was driving the car but that I was the owner.

19.     The Libel of Information did not allege that I had known or consented to any illegal use of the Camaro by Mr. Hammond or anyone else.

20.     On 6/4/2011 after speaking to the District's lawyer and telling him that I had not known or consented to any illegal use of the Camaro by Mr. Hammond or anyone else, at the District's lawyer's suggestion, filed a document in the forfeiture proceeding stating that the Camaro was my car and that I had lent it to Mr. Hammond and that I had not known or consented to any illegal use of the Camaro.

21.     This was my first opportunity to contest the District's seizure and retention of the Camaro and to present my defense that the District's seizure and retention of the Camaro was illegal because I was an "innocent owner."

22.     I attended at least one hearing in the forfeiture proceeding.

23.     Thereafter I could not make further appearances in the forfeiture proceedings because I was overwhelmed by the legal proceedings, I had already spent $250 on a non-refundable penal bond to prevent administrative forfeiture of the Camaro, and I had missed time from work, and I could not afford to miss any more time from work, especially since I had had to buy a replacement vehicle for the car.

24.     The result was the District got a default judgment in the forfeiture proceedings.

AFFIDAVIT OF KIMBERLY KATORA BROWN
PAGE 4

**Ps. Ex. 328, p. 4**
**Kimberly KaTora Brown Affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000004**

25.     While the MPD retained my car I had to pay money every month for insurance and I had

to keep the car titled and registered.  Allowing the insurance to lapse may have subjected me to

liability and allowing the titled and registration to lapse would have caused loss of insurance.

26.     While the MPD had my car I had to make arrangements to use another car and find other

ways to get around.

27.     I really needed the Camaro to fulfill my responsibilities in life.  Being without the car

seriously interfered with my ability to obtain critical life necessities, such as earning a livelihood,

receiving necessary medical care, shopping for necessities such as food and clothing, and visiting

family and friends, helping to care for my family, and getting to places like church.

28.     I live in Maryland and I work on the Orange line in Arlington so I had to rely on public

transportation like metro and buses to get to and from work.

Respectfully submitted,

Kimberly KaTora Brown
May 18, 2013
Washington, DC

AFFIDAVIT OF KIMBERLY KATORA BROWN
PAGE 5

**Ps. Ex. 328, p. 5**
**Kimberly KaTora Brown Affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000005**

**UNITED STATES DISTICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KIMBERLY KATORA BROWN, et al. | ) | |
| | ) | |
| | ) | Civil Action No. 13-569 (KBJ) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GOVERNMENT OF THE | ) | |
| DISTRICT OF COLUMBIA | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

<u>AFFIDAVIT OF ISHEKEBBA BECKFORD</u>

I, Ishekebba Beckford, pursuant to 28 U.S.C. § 1746, certify as true under penalty of perjury

under the laws of the United States of America that the following is true and correct.

1.      I was born in the District of Columbia and I have lived here basically all my life.

2.      Until a couple of years ago I worked for the US Department of Energy when I was laid

off.

3.      Since being laid off I have been the primary caretaker for my grandmother.

4.      As of August 2012 I owned a Lincoln LS.  I titled the car in the District of Columbia in

my full name, Ishekebba Tanisha Beckford, and I had the car a registered in my name and all

required current District of Columbia tags were on the car in my name.

Ps. Ex. 329 , p. 1
Ishebekka Beckford Affidavit
Hoyte v. D.C., 13-569 (CRC)

Brown 000006

5.      The MPD seized my car in late August 2012 and they did not give it back until April 30, 2013.

6.      In late August 2012 my brother Natanjah B. was driving the car.

7.      I was told that the MPD had pulled over my brother while he was driving the Lincoln in the District of Columbia, and that the MPD had arrested Natanjah B., and taken my car.

8.      The MPD did not give Natanjah B. an invoice or any other document stating they had seized the car or providing any instructions on how to get the car or the contents back nor did they provide me with prompt notice informing me they had the car and giving me a prompt opportunity to get it back.

9.      I called the 4th District (the District where I live) and told them my brother had been arrested in my car and the car had been taken and I wanted to know where it was so I could get it back.

10.     The 4th District police told me that he possessed some type of drugs in the car.

11.     As I told the 4th District police, I personally do not know whether Natanjah B. had any drugs on him when he was stopped by the MPD while driving my car.

12.     I did not know that Natanjah B. would use the car to transport marijuana or any other drugs or use the car for any other illegal purpose.

13.     I did not consent to Natanjah B.'s using the car to transport marijuana or any other drugs or for any other illegal purpose.

AFFIDAVIT OF ISHEKEBBA BECKFORD
PAGE 2

**Ps. Ex. 329 , p. 2**
**Ishebekka Beckford Affidavit**
**Brown 000007**
**Hoyte v. D.C., 13-569 (CRC)**

14.     I got the run-around from the 4th District police officers there about where the car was and how to get it back but they did give me a property control number for my car.

15.     Finally after about a week of calling the 4th District officers gave me the number for Blue Plains, but they did not give me a contact name.  I tried calling the number for weeks but every time I called the number I got a message from Verizon or the line was busy. I later learned the number was out of service for some time.

16.     So, I called back the 4th District several times saying I could not get through and they just said I have to keep trying that number.

17.     So after calling back and forth between the 4th District and the non-working number at Blue Plains for about a week the 4th District officers the 4th District officers tell me to go to a police building on Florida Ave., because that's where the car is.

18.     After being unable to reach the number I then went up to a police building located near Florida Ave. (not Blue Plains) with my brother and that is where I gave the front desk my property control number.

19.      The front desk told me who the name of the detective assigned to my case, Detective Lawson, and he was there and they called him to come out to the front desk speak to me.

20.     I spoke with Detective Lawson and informed him that I was the owner of the car and I wanted it back.

21.     Detective Lawson asked me to tell him what happened and he wrote the answers down in a notebook.

Affidavit of Ishekebba Beckford
Page 3

Ps. Ex. 329 , p. 3
Ishebekka Beckford Affidavit
Hoyte v. D.C., 13-569 (CRC)

Brown 000008

22.     I explained to him I had not known or consented to my brother's doing anything illegal in the car.

23.     Detective Lawson asked me to tell him specific details about the stop of my brother but I was not present at the stop.

24.     Detective Lawson said that I needed to follow up by bringing him the title and proof of purchase for the car such as bank statements, etc. and the title.

25.     I went back a couple of days later and provided Detective Lawson with the documents he had requested showing proof that I owned the car.  He made copies and gave the originals back to me.

26.     I followed up with him by phone but Detective Lawson always said he had a back log and had not finished working on my case.

27.     Then I went in person with my two brothers the police building located near Florida Ave. to ask Detective Lawson again about my car.

28.     Detective Lawson again said he was busy and was working on my case to keep calling him and reminding him because he had just returned from the holidays and was busy.

29.     About a month after went to see Detective Lawson with my two brothers I called him and he said the car had been released and I had to speak to a Mr. Rose.

30.     I called Mr. Rose but I could not get the car back.

AFFIDAVIT OF ISHEKEBBA BECKFORD
PAGE 4

**Ps. Ex. 329 , p. 4**
**Ishebekka Beckford Affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000009**

31.     Finally I contacted the District of Columbia Public Defender Service and they helped me regain possession of my car.

32.     I got the car back on April 30, 2013 just a few days after the District of Columbia Public Defender Service began helping me.

33.     While the MPD retained my car I had to pay money every month in insurance and I had to keep the car titled and registered.  Allowing the insurance to lapse may have subjected me to liability and allowing the titled and registration to lapse would have caused loss of insurance.

34.     While the MPD had my car I had to make arrangements to use another car and find other ways to get around.

35.     I really needed the Lincoln to fulfill my responsibilities in life.  I am the primary caretaker for my grandmother.  I have to take her to her various medical appointments and other appointments.  I have to go to the drugstore to get her medications and to the store.  I also have to go to job interviews since I am looking for work.  I also need my car to run all the errands of daily life such as going to the store and carrying home purchases, driving to the bank, and driving to see friends and family.

36.     Here is a partial list of things I had to do without the car:

1)  Drop off and pick up grandmother's prescriptions
2)  Take grandmother to and from the doctor's –eye doctor, main doctor, pulmonologist (all at different locations)
3)  I had to go to doctor's appointments (different locations)
4)  Go on job interviews
5)  Grocery /clothing shopping for my grandmother
6)  Grocery /clothing shopping for myself
7)  Picking up and dropping off mother at work
8)  Take grandma and mom to and from the  bank
9)  Go to my religious establishment every week

**Ps. Ex. 329 , p. 5**
**Ishebekka Beckford Affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000010**

10) Drive to help with volunteering for the community
11) Take my brothers to do errands
12) Visit nieces and nephews
13) Visit friends and family members
14) Taking my niece and nephews to the museums, etc.

Respectfully submitted,

Ishekebba Beckford
May 18, 2013
Washington, DC

Ps. Ex. 329 , p. 6
Ishebekka Beckford Affidavit
Hoyte v. D.C., 13-569 (CRC)

**Brown 000011**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KIMBERLY KATORA BROWN, et al.

          Plaintiffs,

    v.

GOVERNMENT OF THE DISTRICT OF
COLUMBIA

          Defendant

Civil Action No: 13-569 (KBJ)

## AFFIDAVIT OF NICKOYA HOYTE

I, Nickoya Hoyte, pursuant to 28 U.S.C. § 1746, certify as true under penalty of perjury under the laws of the United States of America that the following is true and correct.

1.    I am a life-long resident of the area and at the time of the events described herein I was a resident of the District of Columbia.

2.    As of May 9, 2012 I owned a 2000 Grand Marquis which I purchased for $5,200 in 2008. On about **May 9, 2012** the MPD seized my 2000 Grand Marquis and they did not return it until April 24, 2013.

3.    The 2000 Grand Marquis was titled and registered in my name in Marfyland, and had legal tags on the front and the back of the car as required by law.

4.    At that time I lived in a house in the District of Columbia where I was renting a room in a house where two other people, Jamal and Ali, were also renting rooms in the house.

Exhibit 330, p. 1
Nicloya Hoyte affidavit
Hoyte v D.C., 13-569 (CRC)

5.     On about May 9, 2012 the MPD seized my 2000 Grand Marquis from in front of the house as my house mate (Ali) drove the car up to the house and parked it in front of the house.

6.     The police knew the 2000 Grand Marquis was titled in my name because they found the title to the car in my room in the house.

7.     On May 9, 2012 I had lent the 2000 Grand Marquis to Ali so he could run some errands.

8.     The MPD had come to the house to serve a warrant on the shared residence which was based on information provided by an unnamed "Source of Information."

9.     The officers searched the house pursuant to the warrant.

10.    Officers found me in the shower in my room and my roommate Jamal in his room in the house.

11.    The police reports say they recovered a very small amount of what they believed was personal use marijuana and what they believed was a marijuana seed from the house.

12.    The police reports say in Ali's bedroom officers discovered two handguns guns in a closed drawer in a dresser.

13.    The police reports say the officers arrested Ali as he drove my car up to the house and the police reports say he voluntarily told police that he had some marijuana in the trunk of the car.

14.    I have no personal knowledge whether or not the police found any guns in Ali's room or marijuana in the trunk of my car.

**Exhibit 330, p. 2**
**Nicloya Hoyte affidavit**
**Hoyte v D.C., 13-569 (CRC)**

15.     I did not know Ali would use my car to transport marijuana or for any other illegal purpose.

16.     I did not consent to Ali's using my car to transport marijuana or for any other illegal purpose.

17.     The police arrested all of us in the house.  All three of us got released next day.

18.     At court I was found CJA eligible by the Finance Office.

19.     My case and Jamal's case were nolle'd in diversion.

20.     The officers seized my car that day and took it away but I did not know till the next day when I got back home and it was gone and Ali told me that when the MPD stopped him in the car they found marijuana in it.  He told me that he told the police it was his marijuana in my car and I did not know anything about it.

21.     At the time of the seizure the MPD officers did not give me or Ali any receipt or writing to show they had seized the car and its contents nor did they give us any written instructions on where they were taking the car or how to get it back nor at any time did the MPD give me (by mail or otherwise) notice of a prompt hearing at which I could have an opportunity to regain possession of my car.

22.     I called the 4D (where I was arrested) and they told me to call the Evidence Control Unit.

**Exhibit 330, p. 3**
**Nicloya Hoyte affidavit**
**Hoyte v D.C., 13-569 (CRC)**

23.     The Evidence Control Unit told me I could not just come down and get the car.  The Evidence Control Unit told me there was a process and I had to wait for the process to play out and I would get a notice in the mail.

24.     I got a notice in the mail (dated May 24, 2012) about a month later from the MPD saying, among other things, that the MPD would forfeit my car if I did not pay a bond of $535.

25.     I called the number on the notice and spoke to someone who told me I had to pay the bond (with cash or money order or bank check) even though I was not driving the car when the MPD took it and even though I was certified CJA eligible by the Finance Office in the CJA office.  He did not tell me I could apply for a waiver or reduction.

26.     I got the cash and went to pay the bond and when I got there he told me the system was down.

27.     I had to come back another with the cash.

28.     On or about April 15, 2013 I spoke with a lawyer from the District of Columbia Public Defender Service who said he may be able to help me regain possession of my car.

29.     In about two weeks' time I was able to get my car back. Unfortunately the car did sustain damages while the District had the car including:

   a)  -side view mirror was knocked off

   b)  -rear end shocks were destroyed (car was towed without turning off the air shock switch)

   c)  -car insurance paid of $258.00 (3 months)

**Exhibit 330, p. 4**
**Nicloya Hoyte affidavit**
**Hoyte v D.C., 13-569 (CRC)**

d) -non tag return fee of $45.00

30.    My car had to be towed from the police storage lot when the police released it because it no longer ran.

31.    I never did get my bond back.

32.    There was about $1,500 under the mattress in my room that was missing when I got back. The MPD never gave me a receipt for that either.

33.    While the MPD retained my car I had to pay money every month for insurance and I had to keep the car titled and registered. Allowing the insurance to lapse may have subjected me to liability and allowing the titled and registration to lapse would have caused loss of insurance.

34.    While the MPD had my car I had to make arrangements to use another car and find other ways to get around.

35.    I really needed the car to fulfill my responsibilities in life. Being without the car seriously interfered with my ability to obtain critical life necessities, such as earning a livelihood, going to interviews, receiving necessary medical care, shopping for necessities such as food and clothing, and visiting family and friends, helping to care for my family, and getting to places like church.

Respectfully submitted,

Nickoya Hoyte
May 20, 2013
Hyattsville, MD

AFFIDAVIT OF NICKOYA HOYTE
PAGE 5

**Exhibit 330, p. 5**
**Nicloya Hoyte affidavit**
**Hoyte v D.C., 13-569 (CRC)**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KIMBERLY KATORA BROWN, et al.

          Plaintiffs,

      v.

GOVERNMENT OF THE DISTRICT OF
COLUMBIA

          Defendant

**Civil Action No: 13-569 (KBJ)**

### AFFIDAVIT OF KELLY HUGHES

I, Kelly Hughes, pursuant to 28 U.S.C. § 1746, certify as true under penalty of perjury under the laws of the United States of America that the following is true and correct.

1.     I have lived in the area most of my life.

2.     I bought a 2006 Dodge Magnum in about June, 2012.

3.     The MPD seized my 2006 Dodge Magnum on **February 28, 2013** and they did not return it till about **May 20, 2013**.

4.     For the first five months I owned the car it was in the shop out of my possession and control.

5.     I had been in possession of the car and driving it for only three months when it was seized.

6.     The 2006 Dodge Magnum was titled and registered in my name in the District of Columbia.  The name on the title was a correct mailing address.

**Ps. Ex. 331, p. 1**
**Kelly Hughes affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

Brown 000017

7.    My monthly insurance payment on the 2006 Dodge Magnum and my other cars was about $512 and the monthly note payment is about $403.  I made all payments while the MPD had my car.

8.    On about February 28, 2013 at about 5:00 pm the MPD pulled over my car on the 1000 block of Bladensburg Road in the District.

9.    I was traveling south on Bladensburg Road in the 1000 block with my passenger going to the store.

10.    The police saw us and started following close behind us.  The Dodge Magnum has factory tint on the rear windshield only; there is no tint on any of the other windows.  I did have an air freshener hanging from the dash board.

11.    The police followed me as I turned around on Bladensburg Road to make the turn into the store.  Everyone approaching the store while traveling south makes this turn into the store.

12.    Several MPD officers and detectives stopped us and then searched my car without my consent.

13.    Then they called for a police dog and searched the car again using a police dog.

14.    Detective Dianne Davis then told me that she was seizing my car so she could get a warrant and do a more thorough search.

15.    They also took my and my passenger's purses and cell phones so we had to walk home.

16.    The MPD did not arrest me that night nor have they ever filed a case based on their seizure and search of my car.

AFFIDAVIT OF KELLY HUGHES
PAGE 2 OF 5

**Ps. Ex. 331, p. 2
Kelly Hughes affidavit
Hoyte v. D.C., 13-569 (CRC)**

**Brown 000018**

17.     However, I am told that calls to the Superior Court clerk (as recently as May 21, 20113) and the District Court clerk did not show any warrants issued against me (by name) or the car (by VIN number).

18.     At the time of seizure the MPD did not give me an invoice for my car or its contents or any instructions on how to get my car or the contents back nor at any time did the MPD give me (by mail or otherwise) such an invoice or notice of a prompt hearing at which I could have an opportunity to regain possession of my car.

19.     I spent a great deal of time over the few weeks calling around to various MPD and District government agencies trying to find my car and get it and the contents back.

20.     I spent a great deal of time calling various 5D MPD offices trying to locate my car and to get it back and I got the run around every time.  For weeks the 5D officers kept telling me they did not have my car or know where it was.   They said call the prosecutor.

21.     I called the prosecutor and  they did not have it nor had they authorized a hold.

22.     Finally I learned from the Captain of 5D (with whom I had a filed a complaint) that the car was at Blue Plains so I went there to get it back.

23.     I believe I went to Blue Plains on about 4/2/2013.

24.     The clerk told me that he had a copy of a search warrant which indicated that marijuana had been found in the car but he would not show me the warrant or the return or tell me any details about how much or where in the car the marijuana was allegedly found.

**Ps. Ex. 331, p. 3
Kelly Hughes affidavit
Hoyte v. D.C., 13-569 (CRC)**

**Brown 000019**

25.     I have no knowledge of any marijuana being in my car.  It was not mine if it were in fact in the car.

26.     The clerk told me the District had mailed notice of forfeiture to me.  The address on the notice the clerk hand-delivered to me was my correct mailing address.  It was also the address on the car registration.   But I never received the notice by mail at that address nor did anyone else at that address receive notice from the District about my car.

27.     The clerk hand-delivered a copy of the notice of intent to forfeit the car to me and I signed it to acknowledge receipt.  That letter and my signature are dated 4/2/2013.

28.     The notice required me to pay a penal bond of $982.

29.     I did not feel it was fair to have to pay a bond of almost $1,000 just to prevent forfeiture of my car so I contacted the District of Columbia Public Defender Service and they helped me regain possession of my car.

30.     When Detective Davis seized my car my passenger and I had a lot of personal items (such as a purse and hair clippers) and I had the car registration documents in the car.

31.     My passenger was missing $40 from her purse and the registration was missing.

32.     I really needed my car to fulfill my responsibilities in life.  I needed the car to get to work (I work in a cafeteria and do hair) and run all the errands of daily life such as going to the store and carrying home purchases, driving to the bank, and driving to see friends and family.  Also I am taking a full time truck driving course in Baltimore and I needed the car to get to and from

**Ps. Ex. 331, p. 4
Kelly Hughes affidavit
Hoyte v. D.C., 13-569 (CRC)**

**Brown 000020**

school.  Without the car I had to borrow cars and rides to get to school.  Ultimately I had to buy a
cheap car just to get to school and work.

33.     While the MPD retained the car I had to pay my monthly insurance payment on the 2006
Dodge Magnum of about $512 and the monthly note payment is about $403.  I had to keep the
car titled and registered to keep insurance.  Allowing the insurance to lapse may have subjected
me to liability and allowing the title and registration to lapse would have caused loss of
insurance.

34.     The District allowed me to retrieve my car on about **May 20, 2013**

35.     A few weeks later the MPD returned most of the personal items and my passenger's $40.

Respectfully submitted,

Kelly Hughes
Kelly Hughes
February 14, 2014
Washington, DC

**Ps. Ex. 331, p. 5**
**Kelly Hughes affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000021**

CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY KATORA BROWN, et al. | |
| Plaintiffs, | Civil Action No: 13-569 (KBJ) |
| v. | |
| GOVERNMENT OF THE DISTRICT OF COLUMBIA | |
| Defendant | |

### AFFIDAVIT OF SHANITA WASHINGTON

I, Shanita Washington, pursuant to 28 U.S.C. § 1746, certify as true under penalty of perjury

under the laws of the United States of America that the following is true and correct.

1.      I have lived in the DC area most of my life.  I have been a contractor for the federal

government for about 20 years.  I have a daughter who attends NOVA.

2.      As of **October 2012** I owned a 2007 Nissan.

3.      The Nissan Altima was titled and registered in my name and my mother's name in

Maryland.

4.      The car was subject to a note in my name and my mother's name which had a payment of

$253 every month.  I paid the note every month.  I insured the car through my household policy.

5.      I allowed my daughter to use my car to drive to school and the other places she needed to

go.

6.      On about September 30, 2012 my daughter lent the car to her boyfriend, Tyrell T.

Ps. Ex. 332, p. 1
Shanita Washington affidavit
Hoyte v D.C., 13-569 (CRC)

CONFIDENTIAL

7.      The MPD say they stopped Tyrell T. for speeding on Benning Road and ultimately found a controlled substance in the car.

8.      I personally do not know whether Tyrell T. had any controlled substances on him when he was stopped by the MPD while driving my car.

9.      I did not know that Tyrell T. would any controlled substances in the car or that he would use the car for any other illegal purpose.

10.     I did not consent to his having any controlled substances in the car nor did I consent to his using the car for any other illegal purpose.

11.     The MPD arrested Tyrell T., and seized my car.

12.     The MPD did not give Tyrell T. or me an invoice for the car or any instructions on how to get it or the contents back.

13.     Tyrell T.'s mom called me and told me that Tyrell T. had been arrested and that the MPD had the car at 6D (the District in which the car was seized).

14.     I called the 6th District asking about the car and they told me the MPD had seized my car. I explained to them it was my car and I did not know about or consent to any illegal conduct with the car.

15.     They told me I could not come pick up my car.  They told me to wait for a letter in the mail; that it would be a while; and that I might not get the car back.

**Ps. Ex. 332, p. 2**
**Shanita Washington affidavit**
**Hoyte v D.C., 13-569 (CRC)**

CONFIDENTIAL

16.     I and other family members called an MPD agency which I believe was the asset forfeiture division or some other agency but we were told to wait until we got a letter. The MPD told me that the letter would ask me to pay a bond.

17.     The MPD told me not to pay the bond when I got the letter. They told me when I got the letter to go in and show documents proving I was the owner.

18.     Ultimately I did receive a form letter from the MPD. The letter said that they would take the car unless I paid a bond of $1,135. The letter had a property control number.

19.     I am not positive of the date I received the form letter but I know it was before December, 2012 because I sent a letter in response to the MPD letter dated November 27, 2012.

20.     When I received the letter I called the number on the letter and gave the property control number to the receptionist. She told me Mr. Meyers was handling the case.

21.     I spoke to a Mr. Meyers. I told him I owned the car and that I did not know about or consent to any illegal activity involving the car. I did not even know that my daughter had lent the car to Mr. T.

22.     Mr. Meyers told me to provide all the documents I had proving the car was mine. Pay stubs, tax papers, insurance, Down payment check, sales and loan documents from the car dealer

23.     In response I sent information showing I was the owner along with a statement saying that it was my car and that I did not know about or consent to any illegal activity involving the car and that my daughter really needed the car.

**Ps. Ex. 332, p. 3**
**Shanita Washington affidavit**
**Hoyte v D.C., 13-569 (CRC)**

**CONFIDENTIAL**

24.     Finally, in late April 2013 the District of Columbia Public Defender Service began to help me get my car back.

25.     The MPD returned the car on May 3, 2013.

26.     My daughter really needed the car to fulfill her responsibilities in life.  She needed the car to get from our home in Maryland to her school at NOVA in Alexandria, Virginia, to go to an internship in Tysons Corner, and to run all the errands of daily life such as going to the store and carrying home purchases, driving to the bank, and driving to see friends and family.

27.     While the MPD retained the car I had to pay money every month on the note and in insurance and I had to keep the car titled and registered.  Allowing the insurance to lapse may have subjected me to liability and allowing the title and registration to lapse would have caused loss of insurance.

28.     While the MPD had my car my daughter had to make arrangements to use metro and the bus and borrowed rides and rides from family and friends to get around.

29.     The car has never started right or worked well since the MPD returned it.

June 16 , 2014, signed in _____.

Respectfully submitted,

*Shanita Washington*
Shanita Washington

**Ps. Ex. 332, p. 4**
**Shanita Washington affidavit**
**Hoyte v D.C., 13-569 (CRC)**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY KATORA BROWN, et al. | |
| Plaintiffs, | **Civil Action No: 13-569 (KBJ)** |
| v. | |
| GOVERNMENT OF THE DISTRICT OF COLUMBIA | |
| Defendant | |

<u>AFFIDAVIT OF TANISHA WILLIAMS</u>

I, Tanisha Williams, pursuant to 28 U.S.C. § 1746, certify as true under penalty of perjury under the laws of the United States of America that the following is true and correct.

1.      I have lived in the area most of my life.  For the last year and a half I have worked in the OBGYN department of a major, local hospital.

2.      As of June 2012 I owned a 2006 Nissan Altima.

3.      The Nissan Altima was titled and registered in my name in the District of Columbia.

4.      The MPD seized my 2006 Nissan Altima on about **December 13, 2012** and they did not return it until late **January 2013**.

5.      My monthly insurance payment on the 2006 Nissan Altima was about $379 and the monthly note payment was about $209.

6.      I am pregnant in a high risk pregnancy and the due date is August 12, 2013.

7.      On about December 13, 2012 I lent my car to a friend, David Walton.

**Ps. Ex. 333 , p. 1**
**Tanisha Williams affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000036**

8.      I am told Mr. Walton was inside the car which was parked in a private lot in the District

of Columbia when the MPD approached David Walton in the car, they say, because the car's

alarm was going off.

9.      Allegedly the MPD found a small hand gun in the car which they alleged belonged to Mr.

Walton.

10.     I personally do not know whether **Mr. Walton** had a gun on him when he was stopped by

the MPD while sitting in my car.

11.     I did not know that **Mr. Walton** would use the car to have a gun in the car or for any other

illegal purpose.

12.     I did not consent to his having a gun in the car nor did I consent to his using the car for

any other illegal purpose.

13.     The MPD arrested Mr. Walton, and seized my car, on about December 13, 2012.

14.     Mr. Walton's mom was at the scene when the MPD arrested Mr. Walton and she called

me on her cell phone to tell me what was happening.

15.     Mr. Walton's mom explained to the officers and detectives at the scene that the car

belonged to me, not to Mr. Walton, and Mr. Walton's mom offered with my permission to take

custody of the keys and the car for me.

16.     Mr. Walton's mom asked a detective on the scene to talk to me using her cell phone and

he did.

AFFIDAVIT OF TANISHA WILLIAMS
PAGE 2

**Ps. Ex. 333 , p. 2**
**Tanisha Williams affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000037**

17.     He told me the MPD was seizing my car for civil forfeiture and he gave me the number for the civil forfeiture unit.

18.     At the time of seizure the MPD did not give Mr. Walton an invoice for the car or any instructions on how to get it or the contents back nor at any time did the MPD give me (by mail or otherwise) such an invoice or notice of a prompt hearing at which I could have an opportunity to regain possession of my car.

19.     In fact, I never received any written notice from the MPD or the District about their taking and keeping my car.

20.     A few days later I called the civil forfeiture unit and they told me it would take four to six weeks for the paperwork on the car to reach their unit and a detective to be assigned to my case. My mom also called during this time and was told the same thing.  They told me I would receive a formal notice from the MPD but I never did.

21.     I kept calling the civil forfeiture unit every week asking about the car and on about the third week I was told a detective was assigned to my case.

22.     He asked me to come in and discuss a bond (not to get the car back but to prevent forfeiture) and to discuss getting my car back.

23.     In that same call the detective asked me bring or fax to him a copy of my lease, and documents showing that I was the owner of the car, two pay stubs, and a letter explaining that I did not know or consent to Mr. Walton's having a gun in my car.

**Ps. Ex. 333 , p. 3**
**Tanisha Williams affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000038**

24.     I did not feel it was fair to have to pay a bond just to prevent forfeiture so on the advice of

a lawyer I contacted the District of Columbia Public Defender Service and they helped me regain

possession of my car.

25.     I really needed my car to fulfill my responsibilities in life especially because I was I am

pregnant in a high risk pregnancy while the MPD had my car.  I needed the car to get to work and

run all the errands of daily life such as going to the store and carrying home purchases, driving to

the bank, and driving to see friends and family.

26.     While the MPD retained the car I had to pay money on the note and a total of $379 in

insurance and I had to keep the car titled and registered.  Allowing the insurance to lapse may

have subjected me to liability and allowing the title and registration to lapse would have caused

loss of insurance.


                                    Respectfully submitted,


                                      /sig/ Tanisha Williams
                                    Tanisha Williams
                                    May 20, 2013
                                    Washington, DC


AFFIDAVIT OF TANISHA WILLIAMS
PAGE 4

**Ps. Ex. 333 , p. 4**
**Tanisha Williams affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000039**

EXHIBIT

_A_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FREDERICK SIMMS,<br>2904 7th Street, SE<br>Washington, DC 20032<br><br>　　　　　Plaintiff,<br><br>v.<br><br>THE DISTRICT OF COLUMBIA,<br>Office of the Attorney General<br>441 4th Street, NW<br>Washington, DC 20001<br><br>CATHY LANIER, CHIEF OF POLICE,<br>300 Indiana Avenue NW<br>Washington, DC 20001<br><br>VINCENT GRAY, MAYOR<br>1350 Pennsylvania Avenue, NW, Suite 316<br>Washington, DC 20004<br><br>　　　　　Defendants. | Case No. _____ |

### DECLARATION OF FREDERICK SIMMS

1.　　I, Frederick Simms, am 26 years old and live in Washington D.C.  I am employed at AAAA Storage in Sterling, Virginia.  I have worked there for nearly four years.

2.　　I have been without my car since the police took it on May 29th, 2011.

3.　　Keeping my job has been extremely expensive and difficult since I have been without my car.  I have been forced to take public transportation as close to my job as possible and then catch a ride from a coworker or a cab the rest of the way.  Every morning I have to take a bus to the Anacostia Metro station, then I take the Metro to L'Enfant Plaza.  Then I take the 5A bus from L'Enfant Plaza to the Park & Ride in Herndon, VA, near Dulles Airport.  From there I

Exhibit 334, p. 1
Frederick Simms affidavit
Hoyte v. D.C., 13-569 (CRC)

have to catch a cab the remainder of the way or sometimes get a coworker to drive me because my job is about a ten minute drive from the Park & Ride. The bus from L'Enfant Plaza is $6 each way. When I have to take a cab, it is at least $10 each way. I have to do all of this in the morning and on the way home, which takes an hour-and-a-half to two hours each way and is a total cost of more than $40. I make $12 an hour at my job.

4.      I almost lost my job due to not having a vehicle, because having a vehicle is one of my requirements of employment. I am an assistant manager and often have to run company errands using my own personal vehicle. On several occasions I have had to spend a lot of money renting cars to make it to out-of-town meetings involving my employment. I received reprimands for tardiness due to delays on the public transportation getting to work. I was almost always early to work before I lost my vehicle.

5.      For several months, I moved from my mother's house in Southeast D.C. to Virginia to be closer to work so that I wouldn't have to spend all of that time and money every day to get to work. I rented a place in Virginia and stayed with my fiancée and daughter. Now I am back living with my mother in Southeast.

6.      On December 7, 2011, after my acquittal, I went to the 7th District Police Station regarding my vehicle. I spoke to an MPD officer who informed me that I would need to speak with the detective handling the case. Based on what the officer told me, I went to 17 D.C. Village Lane, where my vehicle was being held, to see if I could find out any information. At that time, I was told that the police wanted to civilly forfeit my car. I was told that there was a bond of around $1,200 on my car and that I needed to pay the bond. I was told that I could not get the car back and that I would still have to speak with the detective handling the case.

**Exhibit 334, p. 2**
**Frederick Simms affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000074**

7.      I called the number I was given for the detective several times, and left several messages before I was finally able to get in contact with the detective. The detective made an appointment for me to meet with her in late December—I think it was the 21st. She said I would need to bring my driver's license, registration, proof of valid insurance, and a buyer's order listing the vehicle's price. I brought all of these things to my meeting. At that time she informed me that I was number twenty on her caseload and to keep in touch with her. I attempted to contact her several times for the following three weeks and when I was able to speak to her again, she said I was still number twenty on the list.

8.      I spoke to someone who also had their property taken who told me I could get the bond waived if I could not afford to pay it. I don't remember any officer telling me that. I submitted an application to get the bond waived. When I got to 17 D.C. Village Lane with the application, the officer told me that the application would have to be notarized. The officer also told me that I would have to bring copies of my tax returns for the last three years. I took time off of work and lost pay to get the application notarized at my bank and to get copies of my tax returns, especially the 2009 return, which I had to get from H&R Block. I went back and submitted the notarized application along with copies of my tax returns from 2009, 2010, and 2011 on March 19, 2012. The MPD officer said it would take a couple of weeks before the paperwork would be processed and that someone would be in touch with me.

9.      I did not hear anything for about a couple weeks. Eventually I went back to 17 D.C. Village lane and learned that the bond was lowered to $800. I cannot afford to pay $800 to try to get my car back. All of the money I make from my wages goes to transportation, rent, daycare, utilities, groceries, car insurance, and the $360 a month I pay on the car loan to Andrews Federal Credit Union for a car I can't even use.

**Exhibit 334, p. 3**
**Frederick Simms affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000075**

10.     This whole situation has been a huge burden on my entire life. It has been costly, time consuming, and embarrassing. The vehicle that is being held by the Metropolitan Police Department is my family vehicle that I used and depended on to transport my fiancée and my 11-month old daughter back and forth to doctor's appointments, daycare, and everywhere else my daughter and fiancée need to be.  In addition to getting me to work and back and using the car at my job, I also depended on my car to get groceries, to run errands like going to the laundromat, to see my friends and family, and to make sure my daughter sees her relatives.

I declare under penalty of perjury that the forgoing is true and correct.

Frederick Simms

Date     4. 30. 2012

4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NELLY MOREIRA,  )
2641 15th Street, NW  )
Washington, DC 20009  )
　　　　　　　　　　　　)
　　　　　　Plaintiff,  )
　　　　　　　　　　　　)
v.  )
　　　　　　　　　　　　)　　Case No. _____
THE DISTRICT OF COLUMBIA,  )
　　　　　　　　　　　　)
CATHY LANIER, CHIEF OF POLICE,  )
　　　　　　　　　　　　)
VINCENT GRAY, MAYOR  )
　　　　　　　　　　　　)
　　　　　　　　　　　　)
　　　　　　Defendants.  )
　　　　　　　　　　　　)

## DECLARATION OF NELLY MOREIRA

　　　1.　　I, Nelly Moreira, am 52 years old. I have lived in Washington, D.C. with my family for 27 years. I have three children, ages 24, 21, and 19, and three grandchildren, ages 6, 3, and 10 months. I am a single mother and grandmother.

　　　2.　　I am employed full-time for Trinity University as a housekeeper. I have worked there for 24 years. I work 40 hours per week, including every Monday through Friday from 7:30 a.m. to 4:00 p.m. I make $15.11 per hour at Trinity University.

　　　3.　　I am also a cleaning lady for 20 hours per week at the Treasury Department, where I work every Monday through Friday from 6 p.m. until 10 p.m. I make $14.85 per hour at that job.

　　　4.　　On March 20, 2012, officers with the Metropolitan Police Department seized my car while my son was driving it. Officers claimed to find a firearm on the person of my son

Exhibit 335, p. 1
Nelly Moreia affidavit
Hoyte v. D.C., 13-569 (CRC)

when they searched him outside the car. I have never given permission to anyone to possess a firearm in my car, and I had no knowledge that a firearm was present in my car. I was not present for the incident, which took place while I was at work.

5.     The police have held my car for almost four months since they took it. At no point have police provided me any chance to challenge their seizure of my car or their decision to hold it indefinitely.

6.     I made numerous phone calls and visits to police stations in an effort to find out information about my car, a 2005 Honda Accord. Eventually, over a month after the car was taken, I was sent a letter telling me to pay $1,020 for the opportunity to contest the seizure. I did not understand that the bond could be reduced or waived if I could not afford to pay it. As a result, I borrowed money in order to pay the police the money they wanted. I was told by police, though, that after I paid the bond I could go to court and get my car and my bond money back.

7.     I paid the police the money on May 21, 2012. Even though nearly two months have passed since that date, I have still received no word about when anything will happen in my case.

8.     I have worked long hours for many years to support my family since I came to this country 27 years ago. Nonetheless, money is very tight. I have a mortgage on my home with Bank of America which requires me to pay $1,349.62 every month. My car note payment to Bank of America is $476.56 every month, which I now have to pay even though the police have my car. Since 2006 when I got the car, I have made on-time payments on my car loan every month. Only recently, after I had to borrow money to pay the police the bond, did I fall behind on my car payment for the first time.

Exhibit 335, p. 2
Nelly Moreia affidavit
Hoyte v. D.C., 13-569 (CRC)

Brown 000157

9.      The increased financial stress has been extremely hard for me and my family. I am now forced to pay significant sums for public transportation to get to and from each job every day. On some days since the police took my car, I have not had enough money for food. I have had to go hungry at work without lunch.

10.     Without my car, I have to wake up almost an hour earlier every morning. Because of my age and serious knee pains, I do not walk fast or move well on public transportation. In addition, I am no longer able to rest at home in between my jobs. I depended on a short nap in between my jobs in order to handle such a long work day given my age and health. Because I cannot do that when I take public transportation, work is much more physically grueling and exhausting now, and it is increasingly harder for me to do it every day.

11.     Losing my car also hurts me because I cannot use it to get to appointments, to get groceries, to see family and friends, and to assist my children with the care of my grandchildren.

I declare under penalty of perjury that the forgoing is true and correct.

_____                              7 - 17 - 12
Nelly Moreira                                         Date

I, Yolin Guevara, translated this document accurately and completely for Nelly Moreira.

Yolin G                                              7/17/12

3

**Exhibit 335, p. 3**
**Nelly Moreia affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEITH CHUNG,<br>841 Rittenhouse St., NW<br>Washington, DC 20011 <br><br>   Plaintiff,<br><br>v.<br><br>THE DISTRICT OF COLUMBIA,<br>Office of the Attorney General<br>441 4th Street, NW<br>Washington, DC 20001<br><br>CATHY LANIER, CHIEF OF POLICE,<br>300 Indiana Avenue NW<br>Washington, DC 20001<br><br>VINCENT GRAY, MAYOR<br>1350 Pennsylvania Avenue, NW, Suite 316<br>Washington, DC 20004<br><br>   Defendants. | Case No. _____ |

## DECLARATION OF KEITH CHUNG

1. I, Keith Chung, am 24 years old and live in Washington D.C. I am employed as a firefighter for the District of Columbia Fire Department. I have worked there for over five years.

2. I have been without my car since the police took it on the evening of June 1, 2012.

3. My regular schedule at the fire department involves at least two 24-hour shifts per week, plus as much overtime as I can get. This sometimes comes to as much as 72 hours of work per week.

Brown 000162

Exhibit 336, p. 1
Keith Chung affidavit
Hoyte v. D.C., 13-569 (CRC)

4.    I am also in school part-time. I am studying to become a licensed paramedic. I have class every Tuesday and Thursday, and on two Saturdays per month.

5.    I relied on my car in order to get to both work and school. My shifts at work begin at 7:00 a.m. When I had my car, I could wake up at 6:00 a.m. and make it to work on time. Now I have to wake up 4:00 a.m. To get to my home station I have to walk six blocks, catch a bus, and then catch a train. I have to carry two bags with me every day. One has my firefighting equipment, including my mask, hood, boots, coat and other gear, which I estimate adds up to almost 100 pounds. The other bag has a change of clothes, a spare uniform, food, water, and a sleeping bag.

6.    Not all of my shifts are at my home station. On any given shift, I may be assigned to any of the 33 fire houses in the District. When I am assigned to one of these other station houses I now have to take public transportation from my home station house to my assigned station house. I have to lug my two bags for those trips as well.

7.    I have a family to support. I live with my elderly grandmother, my mother, who is disabled, my sister, who is pregnant, and my sister's two children. I do my best to support all of them, but that has become harder without my car. I used to be able to drive my grandmother to her medical appointments, take the car to buy groceries for the family, and pick up my niece and nephew from school or camp. Now I have to get help from relatives to do those things, or take public transportation.

8.    Money is tight. The situation is not helped by the fact that I am paying $593.34 per month on a loan for a car that I cannot use. In the past I have worked part-time as an emergency medical technician on a private ambulance in Baltimore. I would like to work there again, and I could really use the income, but without a car I have no way to get to Baltimore.

**Exhibit 336, p. 2**
**Keith Chung affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000163**

9.     I received a letter dated June 12, 2012, that said that I would have to pay a $2075 bond, or the MPD Property Clerk would declare my car forfeited.

10.     I cannot afford to pay the bond.  On June 26, 2012, I submitted an application for a waiver of the bond.  I have not yet heard whether the bond will be waived or reduced.


I declare under penalty of perjury that the forgoing is true and correct.


_____                    07/11/12
Keith Chung                                              Date

Exhibit 336,  p. 3
Keith Chung  affidavit
Hoyte v. D.C., 13-569 (CRC)

Brown 000164

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHARLENE POWELL,<br>12716 Livengood Lane<br>Charlotte, NC 28269<br><br>       Plaintiff,<br><br>v.<br><br>THE DISTRICT OF COLUMBIA,<br><br>CATHY LANIER, CHIEF OF POLICE,<br><br>VINCENT GRAY, MAYOR<br><br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF SHARLENE POWELL

    1.    I, Sharlene Powell, am 66 years old and live in Charlotte, North Carolina. I am retired after approximately 30 years of service at the United States Postal Service.

    2.    I am disabled, and I have had a metal rod inserted into my back. As a result, I have great difficulty walking around. I am in pain every single day as a result of my back. I regularly participate in swim therapy—usually three days per week—to help me manage my back injury.

    3.    I last worked in approximately 2004 and, in 2007, I moved from the District of Columbia to North Carolina. I still visit the District of Columbia regularly to visit family and to see doctors.

    4.    I have a large family, including five grandchildren, ages 28, 27, 15, 14, and 8.

**Exhibit 337, p. 1**
**Sharlene Powell affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

5.      On April 15, 2012, I purchased a car to help me get around.  With a car loan, I purchased a 2007 Infinity G35.

6.      A few days later, on or about April 21, 2012, my son was driving my car. Officers with the Metropolitan Police Department claimed to find a small amount of drugs in his possession.  The police seized my car.  My son was ultimately not charged with a crime.

7.      I have never given anyone permission to possess drugs in my car.  I had no knowledge that any drugs were in my car.

8.      I was at home in Charlotte, North Carolina when the incident occurred.  My son and I had driven to Washington, D.C. to visit family after purchasing the car.  My son wanted to remain in D.C. for a couple of extra days over the weekend, so I took a bus back to Charlotte because I did not want to drive that long distance by myself.  Within the next day or two, the car was seized before my son made the return trip to bring my car back to me.

9.      I have been without my car since the police took it on April 21, 2012.

10.     At no time in the nearly three months that I have been without my car have police provided me any chance to contest their decision to take my car or any chance to challenge their decision to keep my car for months until I can go to court.

11.     Police told me that I would have to pay $1,772 in order to contest the seizure of my car.  I borrowed that money because I did not have enough money to pay the amount they wanted.  I paid that money to police on May 24, 2012.

12.     At great cost to me, I bought the car in April because I needed to get around.  My injury makes it difficult for me to walk and to take public transportation.  I needed to purchase the car so that I could take care of the basic tasks that I need to do every day, such as going to the

2

**Exhibit 337,  p. 2**
**Sharlene Powell affidavit**
**Hoyte v. D.C., 13-569 (CRC)**

**Brown 000160**

store, getting to medical and therapy appointments, going to church every Sunday, and seeing friends and family.

13.     The loss of my car has been very difficult for me personally, physically, socially, and financially.  Even though I now have either to stay at home or to spend extra resources finding other transportation, I am still stuck paying $329 per month on my car note even though the police have my car.

I declare under penalty of perjury that the forgoing is true and correct.

*Sharlene Powell*
Sharlene Powell

*July 17, 2012*
Date

3