# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NICOYA HOYTE, *et al.*,**

          Plaintiffs,

          v.

**DISTRICT OF COLUMBIA**,

          Defendant.

Case No. 13-cv-569 (CRC)

## MEMORANDUM OPINION

In 2015, Mayor Muriel Bowser signed a bill reforming the District of Columbia's civil asset forfeiture regime. The new law was designed to better protect property owners and included a variety of procedural and substantive safeguards to achieve that goal. This case, filed in 2013, is about the old law. Plaintiffs are a group of individuals whose property was seized and held for potential forfeiture under the prior regime. They seek damages under 42 U.S.C. § 1983 for purported violations of their constitutional due process rights. After the better part of a decade, the dismissal of myriad claims, certification of two classes, and extensive discovery, the case has arrived at the summary judgment stage. As it stands, four claims remain: two that have been certified for class-wide resolution and two that have not.

This Opinion deals only with the two non-class claims. In the first of those claims (Claim Seven in Plaintiffs' complaint), all ten remaining Plaintiffs allege that the District unconstitutionally failed to return their property promptly after determining it was not subject to forfeiture. The Court will grant the District's motion for summary judgment as to five of those Plaintiffs who did not lay claim to the property. For the remaining five Plaintiffs, however, the Court will deny both parties' motion for summary judgment and allow the case to proceed to trial. As for the second non-class claim (Claim Fourteen)—which alleges that the District

arbitrarily denied or dissuaded property owners from seeking waivers of a bond requirement to challenge the forfeiture—the Court will grant the District's motion for summary judgment because, on the facts presented, no reasonable jury could find in Plaintiffs' favor.

## I. Background

### A. Legal Background

In 2015, the Council of the District of Columbia reformed the city's civil asset forfeiture law, adding protections for owners of seized property. See Civil Asset Forfeiture Amendment Act of 2014, 62 D.C. Reg. 1,920 (Feb. 13, 2015). Until then, the District's forfeiture scheme had been largely unaltered since 1981. The revamped law has changed many of the aspects of the prior version that gave rise to this case. Nevertheless, the District remains liable for damages stemming from any constitutional infirmities in the law's prior iteration.

The seizures and forfeitures of Plaintiffs' property were governed by former D.C. Code § 48-905.02 (2012). Under this statute, the Metropolitan Police Department ("MPD") had authority to seize vehicles, currency, or other property if there were probable cause to believe the property was the proceeds of a crime or used to commit a crime. Id. §§ 48-905.02(a), (d)(3)(A). Once property was seized, the Mayor was obligated to provide notice to those persons having "a right of claim to the seized property." Id. § 48-905.02(d)(3)(A). Upon receiving notice, the property owner could assert an ownership interest in the property by paying a bond—either $2,500 or ten percent of the appraised property value (whichever was lower). Id. § 48–905.02(d)(3)(B). A claimant could request a bond reduction or waiver. D.C. Mun. Regs. 6-A § 806.6-7.

If the claimant paid the bond (or received a waiver), the District could initiate judicial forfeiture proceedings in District of Columbia Superior Court. D.C. Code § 48-905.02(d)(3)(E)

(2012).  Absent a bond or waiver, the property was subject to administrative forfeiture.  To pursue administrative forfeiture, the Mayor's delegee, the MPD Property Clerk, had to first determine whether the property was forfeitable.  Id. § 48-905.02(d)(3)(C); D.C. Mun. Regs. 6-A § 805.  If the property was deemed forfeitable, the owner was permanently dispossessed of the property.  D.C. Code § 48-905.02(d)(4) (2012).  If it was deemed not forfeitable, the District was obligated to return it to the owner.  Id. § 48-905.02(d)(3)(C).

B.  Factual Background

The Court has discussed the facts of this case at length in two previous opinions.  See Hoyte v. District of Columbia, 325 F.R.D. 485 (D.D.C. 2017); Brown v. District of Columbia, 115 F. Supp. 3d 56 (D.D.C. 2015).  Here, the Court will briefly outline the facts relevant to each Plaintiff's non-class claims.

1.  Nicoya Hoyte

In May 2012, Nicoya Hoyte was arrested at her Washington, D.C. home along with two roommates after police executed a search warrant and found marijuana and weapons.  See Pls.' Response to Def.'s Statement of Undisputed Material Facts ("SUMF"), ECF No. 208-1, ¶ 11.[1] MPD seized her 2000 Mercury Grand Marquis—valued at $5,350—and $1,540 cash incident to the arrest.  Id.; Declaration of Jerrell Carter Supp. Def.'s Opp'n to Pls.' Mot. Partial Summ. J. and Cross-Mot. Summ J. ("Carter Decl."), ECF No. 192-8, at 69–76, ¶ 6(a).[2]  MPD placed the car and currency under a civil forfeiture hold.  Carter Decl. ¶ 6(c).  Hoyte was criminally processed but prosecutors dropped the charges against her.  SUMF ¶¶ 12–13.  The MPD

---

[1]  Citations to "SUMF" refer to the Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts.  Unless otherwise noted, the Plaintiffs indicate no dispute with the facts cited in this section.

[2]  Citations to exhibits accompanying Defendant's Motion for Summary Judgment reflect the page numbers generated by ECF.

Evidence Control Branch's ("ECB") database, EvidenceOnQue, indicates that a notice of intent to forfeit the car was generated May 24, 2012. Id. ¶ 15; Carter Decl. ¶ 6(b).[3] The parties dispute whether this notice was mailed to Hoyte or, if so, whether she received it.[4] See SUMF ¶ 15. What is clear is that she went to the ECB on July 7, 2012 and signed a note indicating she was "in receipt" of the notice. Def.'s Mot. Summ. J. Ex. LL, ECF No. 192-8, at 62. Hoyte paid a bond on the vehicle. SUMF ¶ 16. On April 11, 2013, D.C.'s Office of the Attorney General released its hold on the property, indicating it would not pursue civil forfeiture proceedings. Def.'s Mot. Summ. J. Ex. MM, ECF No. 192-8, at 66. Eight days later, the United States Attorney for the District of Columbia released any evidentiary hold on the vehicle, id. at 67, whereupon Hoyte retrieved the vehicle on April 29, 2013, see Carter Decl. ¶ 6(d). The Office of the Attorney General did not release the hold on the currency until over two years later, on August 17, 2015, and Hoyte retrieved it two days later. See ECF No. 220-3, at 46–48 (MPD property release documentation).

### 2. Kelly Hughes

MPD seized Kelly Hughes's 2006 Dodge Magnum—valued at $9,825—on February 28, 2013. SUMF ¶ 17; Carter Decl. ¶ 7(a). According to police records, an MPD drug sniffing dog "got a hit on the vehicle." Def.'s Mot. Summ. J. Ex. A, ECF No. 192-5, at 3. MPD placed evidentiary and forfeiture holds on the vehicle. SUMF ¶ 18. Ms. Hughes was never charged with a crime related to the incident. See Affidavit of Kelly Hughes ("Hughes Aff."), ECF No. 220-3, at 24–28, ¶ 16. EvidenceOnQue shows a notice of intent to forfeit was generated on

---

[3] The Court understands Plaintiffs to dispute whether notice was actually mailed or received but not the fact that the database reflects its existence. See, e.g., SUMF ¶ 15 ("The mere fact of administrative forfeiture notice in EvidenceOnQue does not mean it was mailed.").

[4] This dispute is central to Claim Five, which alleges a failure to provide adequate notice, but not the other claims.

March 21, 2013.  SUMF ¶ 19; <u>see also</u> <u>supra</u> note 3.  On April 2, 2013, Hughes went to the ECB

to inquire about her vehicle and received in-person notice of the intent to forfeit.  SUMF ¶ 20.

The notice required Hughes to pay a $982 bond; she avers that, instead of paying, she contacted

the D.C. Public Defender Service, which helped her recover her vehicle. Hughes Aff. ¶¶ 28–29.

The holds were lifted on May 1, 2013.  Carter Decl. ¶ 7(c).  Hughes retrieved her vehicle on May

24, 2013.  SUMF ¶ 21.

### 3.  Jarrett Acey

On October 30, 2010, MPD officers arrested Jarrett Acey for possession with intent to

distribute MDMA.  Officers seized $1,516 in cash from Mr. Acey for forfeiture.  SUMF ¶ 39;

Def.'s Mot. Summ. J. Ex. R, ECF No. 192-7, at 49–52.  MPD sent a notice to administratively

forfeit the property to Acey's mother's home, which was the address on his arrest report.  SUMF

¶ 40.  The parties dispute whether the address was listed on his arrest report because he provided

it to MPD when arrested or because officers took it from his driver's license.  <u>Id.</u>  In any case,

Acey saw the notice at his mother's home when visiting her in 2013, prompting him to call MPD

to update his address.  <u>Id.</u> ¶¶ 41–42.  MPD sent a second notice to Acey at the address he

provided.  By the time he received that notice, the property had already been forfeited.  <u>Id.</u> ¶ 42.

### 4.  Julius Gordon & Marilyn Langley

In February 2011, MPD officers arrested Julius Gordon and Marilyn Langley for

distribution and possession of Suboxone, respectively.  <u>See</u> ECF No. 220-5, at 79–81 (arrest

report).  They seized $49 in connection with the arrest, $44 from Mr. Gordon and $5 from Ms.

Langley.[5]  SUMF ¶¶ 43–44, 47.  Prosecutors declined to prosecute either individual.  Carter

---

[5] At the motions hearing, Defense counsel suggested that the full $49 may have been
seized from Mr. Gordon, or at least that the arrest records reflect as much. Hr'g Tr. 60:22–61:11
(Jan. 22, 2019).  The record shows clearly, however, that all MPD documents indicate that $44

Decl. ¶¶ 12(d), 13(c).  Two years later, ECB sent a notice to Gordon at the address he gave

MPD.  See ECF No. 220-5, at 82–83 (notice dated March 5, 2012).  He did not pay a bond or

apply for a waiver and maintains he never received notice.  No notice was sent to Langley.  The

$49 was forfeited.  SUMF ¶¶ 46, 49.

### 5.  Terrence Thomas

MPD executed a search warrant on the home of David Littlepage, which he shared with

his son Terrence Thomas.  SUMF ¶ 51.  Officers arrested Mr. Littlepage and seized $340 in cash

during the search, apparently from under Mr. Thomas's mattress.[6]  Id.  ECB sent three notices to

Littlepage after identifying him as the property owner.  Id. ¶ 52.  According to Littlepage, upon

receiving these notices, he told ECB that the money belonged to his son.  See Affidavit of David

Littlepage, ECF No. 177-4 9, ¶ 10.  He later signed a "release to owner" form and picked up the

money from ECB.  SUMF ¶ 54; Def.'s Mot. Summ. J. Ex. FF, ECF No. 192-8, at 30–51.

### 6.  Shane Lucas

MPD seized $814 from Shane Lucas on October 3, 2012 upon his arrest for possession of

an open container of alcohol.  SUMF ¶ 56; Def.'s Mot. Summ. J. Ex. II, ECF No. 192-8, at 37–

40.  MPD officers found drugs on his person during a search incident to the arrest and charged

him with drug possession.  Def.'s Mot. Summ. J. Ex. II, ECF No. 192-8, at 37–40.  The charges

were later dismissed.  Carter Decl. ¶ 15(e).  The ECB database shows two notices were mailed,

one to the address on Lucas's driver's license and one, sent six months later, to the address he

provided to MPD when arrested.  SUMF ¶¶ 57–59; see also supra note 3.  On November 7, 2013,

---

was seized from Gordon and $5 was seized from Ms. Langley.  See, e.g., ECF No. 220-5, at 79–
81 (arrest report); id. at 77–78 (property record); id. at 82–83 (notice mailed to Mr. Gordon
regarding $44).

[6] Plaintiffs insist it was $345, but the $5 difference does not affect the Court's analysis.
See SUMF ¶ 51.

D.C.'s Office of Attorney General sent a memorandum to the ECB indicating that the crime with which Lucas was charged did not permit forfeiture and that the money should be returned to him. ECF No. 177-51. On February 7, 2014, Lucas was told he could pick up his money at ECB, which he did later that day. SUMF ¶¶ 61–62.

### 7. Romona Person

MPD seized Romona Person's 2010 Nissan Altima in November 2012. Id. ¶ 27. She contacted the ECB to inquire about the car and was given a notice of intent to forfeit the vehicle. Id. ¶ 29. Ms. Person neither paid a bond nor applied for a bond waiver. Instead, she relinquished the title to the lienholder, which later retrieved the car. Id. ¶ 30.

Person filed for bankruptcy in 2015. Id. ¶ 31. The bankruptcy court discharged her debts in November 2015 and closed her case that day. Id. ¶ 32. Although she knew this lawsuit was pending at the time, she did not list her claims among the assets in her bankruptcy petition. Def.'s Mot. Summ. J. Ex. H, ECF No. 192-6, at 7–8; see also Def.'s Mot. Summ. J. Ex. F, ECF No. 192-5, at 59–100.

### 8. Dorian Urquhart

MPD seized Dorian Urquhart's 2004 Pontiac Grand Prix, valued at $8,225, on April 24, 2011 from a parking space after smelling and seeing marijuana inside. SUMF ¶ 33; Carter Decl. ¶ 10(a); Def.'s Mot. Summ. J. Ex. B, ECF No. 192-5, at 8–9. It does not appear that Mr. Urquhart was charged with a crime. He received a notice of intent to forfeit the vehicle and applied for a bond waiver on June 4, 2011 but omitted tax information required by ECB. SUMF ¶¶ 35–37. As a consequence, ECB denied his bond waiver application on July 5, 2011. Id. ¶ 37. The Office of Attorney General released the forfeiture hold on the car on July 26, 2012, and Urquhart retrieved it on August 13, 2012. See ECF No. 220-1, at 44.

### 9. *Stephen May*

Stephen May lent his 2003 Infiniti M45 to Darryl Driver, a friend. Mr. Driver was arrested on May 11, 2012 for drug possession to which he pled guilty. SUMF ¶¶ 22–23. MPD seized Mr. May's Infiniti and placed a forfeiture hold on it in connection with Driver's criminal case. Id. ¶ 24. May went to the ECB to reclaim his vehicle. Id. ¶ 25. On May 18, 2012, he received notice of intent to forfeit his vehicle. Id. ¶ 26. He applied for a bond waiver application, which was granted. He retrieved his vehicle on October 9, 2012. Id. ¶ 25.

### C. Procedural Background

In 2013, Plaintiffs were among twenty-two people who sued the District of Columbia for damages caused by an allegedly unconstitutional civil forfeiture regime. The case initially had sixteen claims, some of which the Court dismissed and some of which the Plaintiffs voluntarily withdrew. See generally Brown, 115 F. Supp. 3d 56. As of 2017, five claims survived and Plaintiffs sought to certify four of them for classwide resolution (they have since voluntarily dismissed the fifth claim). See generally Hoyte, 325 F.R.D. 485. This Court certified as class actions two of these claims but declined to certify the other two. Specifically, the Court certified classes seeking damages for (1) the prior statute's failure to provide for prompt interim hearings for the owners of seized cars (Claim Three in the complaint), see id. at 492–95, and (2) the District's purported failure to provide constitutionally adequate notice of forfeiture proceedings for owners of seized vehicles and currency (Claim Five), see id. at 495–98. The Court denied class certification to Plaintiffs seeking damages for (1) the retention of property after the District determined that it was not subject to forfeiture (Claim Seven), see id. 498, and (2) the denial or discouragement of waivers for those who could not afford to pay bonds in order to lay claim to the property and challenge its forfeiture (Claim Fourteen), see id. 498–99.

After extensive discovery, the parties cross-moved for summary judgment on both the remaining class claims and non-class claims. Unfortunately, the parties' briefing of the issues raised more questions than it resolved. The Court held a lengthy hearing on the cross-motions, where it became apparent that the District had failed to grasp the burden-shifting framework governing the claims. See Thompson v. District of Columbia, 832 F.3d 339, 346–47 (D.C. Cir. 2016) (discussing Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977) and Carey v. Piphus, 435 U.S. 247 (1978) to explain that once a plaintiff shows a due process violation, he is entitled to compensatory damages unless the *defendant* can show that the deprivation would have occurred with proper process). Plaintiffs, for their part, correctly identified this framework, but failed to grapple with its consequences for classwide resolution. In any case, each party conveyed a willingness to enter settlement discussions. The Court therefore took a somewhat unusual step. To inform settlement discussions, it held a status conference in which it explained its preliminary views on the cross-motions for summary judgment on the class claims. Each side reiterated its interest in a settlement and offered to make good faith efforts to seek one, while indicating that final resolution of the non-class claims would aid these efforts. Accordingly, the Court will continue to defer on formal adjudication of the summary judgment motions regarding Claims Three and Five, the class claims, while deciding the pending motions for summary judgment on the two non-class claims, Seven and Fourteen.

## II.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" if the resolution "might affect the outcome of the suit under the governing law" and "genuine" if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A court must accept as true the nonmovant's evidence and draw all reasonable inferences in its favor. <u>Id.</u> The nonmovant may not, however, rely on "mere allegations" or conclusory statements. <u>Veitch v. England</u>, 471 F.3d 124, 134 (D.C. Cir. 2006).

## III. Analysis

Each of the Plaintiffs pursue Claim Seven, seeking damages for the District's purported failure to provide constitutionally adequate notice of their ability to retrieve their property upon a non-forfeiture determination. Uruqhart and May alone pursue Claim Fourteen, seeking damages for a claimed unconstitutional denial of bond waivers.

Plaintiffs seek damages under 42 U.S.C. § 1983, which creates a cause of action for damages against state or local officials who violate a plaintiff's federal constitutional rights. Section 1983 does not provide for *respondeat superior* liability, meaning a municipality cannot be held vicariously responsible for constitutional violations by its officers or employees. Rather, to prevail on their § 1983 claims against the District itself, Plaintiffs must show both predicate constitutional violations and an "affirmative link" between those violations and a District "custom or policy," such that the policy itself "was the 'moving force' behind the violation[s]." <u>Baker v. District of Columbia</u>, 326 F.3d 1302, 1306 (D.C. Cir. 2003); <u>see also</u> <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 694 (1978). That in mind, the Court turns to each claim.

### A. <u>Claim Seven: Failure to Return Non-Forfeitable Property</u>

Each of the remaining Plaintiffs pursue Claim Seven, alleging that the District failed to promptly return their property once MPD decided not to forfeit the property or deemed it non-forfeitable. As the Court held at the motion to dismiss stage when it allowed this claim to proceed to discovery, "[a]fter the District determined it had no right to the property, any ongoing

retention—even if temporary—was contrary to due process." <u>Brown</u>, 115 F. Supp. 3d at 74

(citing <u>Fuentes v. Shevin</u>, 407 U.S. 67, 82 (1972); <u>Walters v. Wolf</u>, 660 F.3d 307, 315 (8th Cir.

2011)).  Reflecting this principle, the disposition of each Plaintiff's claim at summary judgment

turns on *whether* the District determined it had no right to the seized property, as explained

below.

### 1. *Plaintiffs Who Did Not Pay the Bond*

First: Gordon, Langley, Thomas, and Acey.[7]  The District is entitled to summary

judgment on these Plaintiffs' claims, because it did not hold their property for longer than it was

entitled.  Recall that none of these Plaintiffs paid bonds, sought or received waivers, or otherwise

laid claim to the forfeited property.  Under the statute, then, the property could be forfeited.

This result might seem odd at first blush.  After all, these same Plaintiffs contend in

Claim Five (one of the class claims) that the District failed to provide them notice of the intent to

forfeit.  If that's true, then how can they be faulted for failing to respond to that notice in a way

that would preserve their interest in the property?  However, if they suffered constitutional

injury, that injury happened at step one—when the District allegedly failed to send notice

"reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

of the action and afford them an opportunity to present their objections." <u>Jones v. Flowers</u>, 547

U.S. 220, 226 (2006) (quoting <u>Mullane v. Hanover</u>, 339 U.S. 306, 314 (1950)).   Anything that

occurred *after* that—namely, Plaintiffs failing to claim the property and the District

dispossessing them of ownership—stemmed from *that* violation.  Both go to the same underlying

facts and same claimed damages: the purported failure to send constitutionally adequate notice

and the resulting forfeiture of the property.  Cf. <u>Brown</u>, 115 F. Supp. 3d at 63 (dismissing Fourth

---

[7]  The Court discusses Plaintiff Romona Person below, <u>see</u> <u>infra</u> Part III.A.3, but she also
falls into this category of Claim Seven Plaintiffs.

Amendment claims where "[t]he factual allegations supporting these claims [were] duplicative of identical claims brought under the Fifth Amendment" and claims were properly brought under Fifth Amendment).

Plaintiffs insist that the District *necessarily* kept the property longer than necessary, because under its own law, the District was not entitled to forfeit the property unless it received a "green card"—a return receipt confirming that the notice was delivered. See Pls.' Mot. Summ. J. at 55 (citing D.C. Code § 48-905.02(d)(3)(C)(2012)). Thus, Plaintiffs' theory goes, because D.C. law conditioned forfeiture on a return receipt, any time the District failed to receive such receipt, its forfeiture of the property was "void *ab initio*" and the District failed to promptly return the property. Id. But as this Court explained in a different case in which a plaintiff mounted a due process claim stemming from the District's alleged failure to follow its laws and regulations, "a person is not deprived of due process whenever a government entity fails to follow procedures established by statute or regulation." Classic Cab, Inc. v. District of Columbia, 288 F. Supp. 3d 218, 226 (D.D.C. 2018) (citing Sloan v. Dep't of Hous. & Urban Dev., 231 F.3d 10, 18 (D.C. Cir. 2000)). Reading the Due Process Clause otherwise would "constitutionalize[] all state-imposed procedural requirements" and "thrust federal district courts into the role of reviewing all state administrative decisionmaking, dramatically expanding the scope of federal jurisdiction and violating basic principles of comity." Id.

This principle dictates the outcome here. While the District may have failed to comply with its own statutory requirement, that does necessarily create a federal constitutional claim. Even if D.C. law did not permit forfeiture absent a returned green card, the relevant question for this Court is whether the Constitution does. "[M]ail service is an inexpensive and efficient mechanism that is reasonably calculated to provide actual notice," Lepre v. Dep't of Labor, 275

F.3d 59, 70 (D.C. Cir. 2001) (quoting Tulsa Prof. Collection Servs. v. Pope, 485 U.S. 478, 490 (1988)), and even if D.C. law required actual notice in the form of a return-receipt, the Constitution does not, see, e.g., id. at 70–71.  As explained, whether the underlying notice of intent to forfeit the property was constitutionally adequate forms the basis of Claim Five (which the Court has determined is amendable to partial classwide resolution).  Thus, to the extent that Gordon, Langley, Thomas, and Acey had their due process rights violated, it was because the District failed to give constitutionally adequate notice of the intent to forfeit the property, not because it took the property after hearing nothing from these Plaintiffs.  Once these Plaintiffs failed to lay their claim to the property (perhaps through no fault of their own, to be sure), there was no constitutional violation in failing to alert them that they could claim their property— because they *couldn't* claim their property.  Of course, that's not to say they cannot recover damages if their constitutional rights were violated due to a District custom or policy, but any such recovery would come through prevailing on Claim Five.

### 2. Plaintiffs Who Paid the Bond

Hoyte, Hughes, Lucas, May, and Urquhart,[8] unlike the Plaintiffs discussed above, did receive notice of intent to forfeit their property and eventually recovered their property because they either paid the necessary bond or received a waiver—and the District decided the property was either not forfeitable or chose not to pursue forfeiture.  In some cases, however, there was a substantial lag between when the property was returnable and when it was returned.  Take, for example, Shane Lucas.  MPD arrested him for having an open alcohol container (later adding drug possession charges) and seized $814.  SUMF ¶ 56; Def.'s Mot. Summ. J. Ex. II, ECF No.

---

[8] While Urquhart neither paid the bond nor received a bond waiver, see infra Part III.B, he did eventually recover his vehicle, because the District opted not to proceed with forfeiture, see ECF No. 220-1, at 44.  As such, the Court places him in this category of Plaintiffs.

192-8, at 37–40; Def.'s Mot. Summ. J. Ex. II, ECF No. 192-8, at 37–40.  On November 7, 2013, the Chief of the Office of the Attorney General's Civil Enforcement Section sent a memorandum to the head of the ECB, explaining that it would decline to pursue forfeiture of Lucas's cash because "[u]nder D.C. law, mere possession [was] not a sufficient basis for forfeiture."  ECF No. 177-51, at 1.  The memorandum included Lucas's address and noted that the property should "be returned to [him]."  Id.  But it wasn't.  Lucas did not receive his property until February 7, 2014, exactly three months later, when he went to ECB to pick it up after being informed of his right to do so earlier that day.  SUMF ¶¶ 61–62.

Or consider the case of Kelly Hughes.  Her car was seized on February 28, 2013 when a drug-sniffing dog got a "hit" on it.  SUMF ¶ 17; Carter Decl. ¶ 7(a); Def.'s Mot. Summ. J. Ex. A, ECF No. 192-5, at 3.  She was never arrested, and no case was pursued.  Hughes Aff. ¶ 16.  She received in-person notice of intent to administratively forfeit.  SUMF ¶ 20.  On May 1, 2013, the District declined to pursue the forfeiture proceedings and changed the property from a "forfeiture" hold to a "safekeeping" hold.  See ECF No. 220-5, at 53–54.  But the vehicle was not returned until over three weeks later, on May 24.  SUMF ¶ 21.  In the meantime, Hughes avers, she needed a car to go to work, take care of personal responsibilities, and attend a vocational training program in which she was enrolled.  Hughes Aff. ¶ 32.

For the Plaintiffs who were entitled to (and ultimately did) retrieve their seized property, there are genuine disputes of material fact.  These disputes include, notably, whether the District had a custom or policy of holding property longer than necessary while not notifying the owners of their ability to retrieve it.  The sheer number of Plaintiffs in this case whose cars or currency were held well after the District had disclaimed any forfeiture rights might, alone, permit the reasonable inference of such a custom.  On the other hand, a reasonable jury might also conclude

otherwise. Some of the Plaintiffs, for example, received their property within a week or less of the District's non-forfeiture determination. See, e.g., Carter Decl. ¶¶ 8(c), (e) (indicating May retrieved his vehicle within days of the lifting of the forfeiture hold). To be sure, they appear to have successfully done so because *they* followed up with ECB, but a jury might reasonably conclude that the District did not have a problematic custom or policy that was the moving force behind any alleged violations. As the Court explained when it declined to certify this class, while Plaintiffs provided evidence that "approximately 598 vehicles ha[d] been initially seized for forfeiture in connection with criminal activity but later released before forfeiture," that "says nothing about how many vehicles the MPD failed to *promptly* return." Hoyte, 325 F.R.D. at 498 (citations omitted). The same holds true here: a jury, faced with this figure and a handful of examples of failure to promptly return property (assuming they considered each of the returns not prompt) might reasonably infer that the District did not have a custom or policy that was the moving force behind any temporary deprivation Plaintiffs suffered.

The record in this case is among the most voluminous the Court has encountered. After careful consideration of its contents, the Court concludes that it cannot take this claim from a jury. There are facts that could reasonably support different conclusions. Therefore, the Court will deny each motion for summary judgment regarding Claim Seven as it pertains to Hoyte, Hughes, Lucas, May, and Urquhart. Those Plaintiffs' claims may proceed to trial.

### 3. *Romona Person*

That leaves Romona Person. As discussed above, Person filed for bankruptcy in 2015, while this suit was pending, and the bankruptcy court discharged all of her debts. See SUMF ¶¶ 31–32. Person did not list this lawsuit when declaring her assets in her bankruptcy petition. Def.'s Mot. Summ. J. Ex. F, ECF No. 192-5, at 59–100 (bankruptcy records). As a consequence,

the District is entitled to summary judgment on her claim because she is judicially estopped from pursuing it.

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting 18 Moore's Federal Practice § 134.30 (3d ed. 2000)). It is "an equitable doctrine invoked by a court at its discretion." Id. at 750. The D.C. Circuit has instructed that

> [t]here are at least three questions that a court should answer in deciding whether to apply judicial estoppel: (1) Is a party's later position clearly inconsistent with its earlier position? (2) Has the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled? (3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped?

Moses v. Howard Univ. Hosp., 606 F.3d 789, 798 (D.C. Cir. 2010) (citing Maine, 532 U.S. at 750–51). Additionally, courts must consider whether there is a "discernible connection between the two proceedings" and "may not invoke judicial estoppel against a party" where "there is no meaningful connection." Id. at 799.

Here, Ms. Person's case meets each of the three factors the Circuit identified in Moses. First, Person's earlier position is inconsistent with her current one. She pursued her claim here after she sought Chapter 7 bankruptcy, even after neglecting to disclose this claim in her bankruptcy petition. See Moses, 606 F.3d at 799. Second, Person succeeded in persuading the bankruptcy court to accept her earlier position, leading that court to discharge her debts. See id. Third, Person derived an unfair advantage from her inconsistent positions. If Person were to succeed in this case, she would keep any damages, to the detriment of her creditors. See id. That outcome would also harm the District: "Had the [bankruptcy] trustee known of this lawsuit

during the Chapter 7 bankruptcy proceedings, she might have settled this case early or decided not to pursue it, actions that might have benefitted [the District]." Id. Finally, Person's pursuit of this claim and her actions in the bankruptcy proceeding are related in that she represented that she had no legal claims during the bankruptcy proceeding, leading to a discharge of debts, and now seeks to "assert the opposite in order to win a second time." Id. at 800. In analogous cases, the D.C. Circuit and courts in this district have held that judicial estoppel applies where a plaintiff failed to disclose claims for monetary damages during a separate bankruptcy proceeding. See, e.g., id.; Robinson v. District of Columbia, 10 F. Supp. 3d 181 (D.D.C. 2014); Marshall v. Honeywell Tech. Sys., 73 F. Supp. 3d 5 (D.D.C. 2014).

Person insists the equitable nature of judicial estoppel counsel against its application in this case, contending her failure to disclose the claim was inadvertent. The Court sympathizes with Ms. Person, but courts interpret inadvertence "such that '[t]he failure to comply with the Bankruptcy Code's disclosure duty is 'inadvertent' only when a party either lacks knowledge of the undisclosed claim or has no motive for their concealment.'" Robinson, 10 F. Supp. 3d at 187 (quoting Barger v. City of Cartersville, 348 F.3d 1289, 1295 (11th Cir. 2003)). Here, Person was aware of this claim during the bankruptcy proceedings, since it was already pending. While she may not have understood her duty to disclose the claims in bankruptcy, she clearly had actual knowledge that she had filed the claim. See id. at 188.

As for motive, courts are particularly strict about mistake defenses when the supposed mistake was made during a bankruptcy proceeding. "This prevailing 'interpretation of 'inadvertence' is narrow in part because the motive to conceal claims from the bankruptcy court is . . . nearly always present.'" Id. at 187 (quoting Ah Quin v. Cnty. of Kauai Dep't of Transp., 733 F.3d 267, 271 (9th Cir. 2013)). Put simply, if Person had disclosed this case in bankruptcy,

any damages could have been applied to her debts; by failing to do that, she would now be able to keep the damages after the discharge of her debts. Courts are necessarily strict in this context. See id., 10 F. Supp. 3d at 184–85 ("Viewed against the backdrop of the bankruptcy system and the ends it seeks to achieve, the importance of this disclosure duty cannot be overemphasized." (quoting In re Coastal Plains, Inc., 179 F.3d 197, 208 (5th Cir. 1999)).

While the Court trusts that Person did not realize she had a duty to disclose her claims, it is clear she had actual knowledge of the claims themselves. That is enough to bar them, even though she was unrepresented in bankruptcy. See Marshall, 73 F. Supp. 3d at 11 (Plaintiff's "mistake as a pro se litigant does not excuse her failure to properly disclose her discrimination claims."). In short, "the federal courts have developed a basic default rule: If a plaintiff-debtor omits a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and obtains a discharge (or plan confirmation), judicial estoppel bars the action." Robinson, 10 F. Supp. 3d at 185 (quoting Ah Quin, 733 F.3d at 271). The Court will not depart from that rule here.

Person also contends that the Court should not bar her claims because she attempted to disclose the lawsuit after the District raised the issue. Precedent forecloses such leniency:

> As the D.C. Circuit emphasized in Moses, allowing a debtor 'to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them. This so-called remedy would only diminish the necessary incentive for the debtor to provide the bankruptcy court with a truthful disclosure of [his] assets.'

Id. at 186 n.3 (quoting Moses, 606 F.3d at 800)). In sum, the weight of authority bars Person's claim. A contrary conclusion would be unfair to both her creditors and the District.

In any case, even Person weren't estopped, she could not recover on Claim Seven. The record indicates that she never filed a claim for her car, declining to pay the bond or apply for a

bond waiver.  Instead, she relinquished title to the car to the lienholder, which retrieved it.

SUMF ¶ 30.  Thus, for similar reasons to the other Plaintiffs who never asserted an ownership

interest, she cannot pursue Claim Seven on the theory that the District held the property after it

was required to return it to her, because the District was never required to return it to her.  See

supra Part III.A.1.

     B.  Claim Fourteen: Arbitrary Denial of Bond Waivers

     Claim Fourteen alleges that the District unconstitutionally denied Plaintiffs bond waivers

or dissuaded them from seeking such waivers.  The Court dismissed Plaintiffs' facial challenge

to the claim, see Brown, 115 F. Supp. 3d at 72, but allowed as-applied challenges to proceed as

non-class claims, see id. (denying motion to dismiss as-applied challenge); Hoyte, 325 F.R.D. at

498–99 (denying class certification).  Two Plaintiffs, Stephen May and Dorian Urquhart, pursue

this claim.  Neither has shown a basis for a reasonable jury conclusion in their favor, and the

District is therefore entitled to summary judgment.

     As an initial matter, no reasonable jury could conclude that Mr. May was

unconstitutionally denied a bond waiver—because he was granted one.  In its Statement of

Undisputed Material Facts, the District submitted that "May . . . filed a bond waiver application,

which was granted, and was able to promptly retrieve his vehicle."  SUMF ¶ 25. Plaintiffs

responded that this fact was "[n]ot disputed for purpose[s] of the District's summary judgment

motion."  Id.  It appears, then, that May might have abandoned this claim, though he has not

done so explicitly.  In any event, May testified in his deposition that he completed the waiver

application around September 25, 2012 (corresponding to the date on the application).  See

Def.'s Mot. Summ. J. Ex. E, ECF No. 192-5, at 52–54; ECF No. 22-6, at 32 (bond waiver

application).  It is undisputed that the waiver was granted and May retrieved his vehicle on

October 9, 2012.  SUMF ¶ 25.  On this record, no reasonable jury could conclude that May was unconstitutionally denied a bond waiver.  Nor is there anything in the record to suggest that anyone dissuaded May from applying for one.  To the contrary, May testified that he "made some phone calls down to [the ECB] and [the bond waiver application process] was explained to [him]."  Def.'s Mot. Summ. J. Ex. E, ECF No. 192-5, at 52.  The District is thus entitled to summary judgment.

As for Mr. Urquhart, it is undisputed that he, unlike May, was not granted a bond waiver.  The record shows, however, that the waiver was because he declined to provide tax information necessary to support the application.  SUMF ¶¶ 35–37.  Urquhart does not appear to contend that his rights were violated because the bond waiver was denied due to an incomplete application.[9]  Instead, he focuses on purposed discouragement from the District.  He points to deposition testimony in which he alleged that while ECB officers never told him not to apply for a bond waiver, they did "say [he] was wasting [his] time."  Reply at 60.  Whatever was said, Urquhart *wasn't* dissuaded:  He applied and was rejected—because he failed to include the tax information.  In any case, Urquhart has marshaled insufficient evidence to support a jury conclusion that the moving force behind this event was a District pattern or practice.[10]  He notes that "[o]ut of 10,000 seizures, there are only about 200 waiver applications," id., but this is not probative of *why* the others owners did not apply for waivers, if they even pursued the property in the first place.  See Hoyte, 325 F.R.D. at 498 (declining to certify a class claim because the

---

[9]  As noted, the Court dismissed a facial challenge to this aspect of the law, which makes Urquhart's passing reference to the unconstitutionality of requiring tax information misplaced. See Pls.' Reply at 60.

[10]  Plaintiffs do not devote any space in their fifty-five-page Motion for Summary Judgment to Claim Fourteen and spend only a paragraph of their sixty-page opposition to the District's Motion for Summary Judgment on the claim.

Plaintiffs relied on generalized figures but offered no evidence to indicate that those figures evinced frequency of a purportedly unconstitutional practice).

Equally misplaced is Plaintiffs' emphasis that "the Notes section in the [database] mentions waivers in only about 60 seizures," Reply at 60, because there is nothing to suggest that the other applications were improperly rejected (assuming they were rejected, as opposed to withdrawn or mooted). In short, even if these figures were presented to a jury, there would be no basis that would permit it to conclude those figures are due to a pattern of improper denial or dissuasion. Cf. Hoyte, 325 F.R.D. at 498 (noting that Plaintiffs offered no evidence in support of number of would-be claimants who were denied a waiver). The District is thus entitled to summary judgment.

**IV. Conclusion**

For the foregoing reasons, the Court will deny in part and reserve in part on Plaintiffs' Motion for Partial Summary Judgment and grant in part, deny in part, and reserve in part on Defendant's Cross-Motion for Summary Judgment. A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  August 12, 2019